FILED
COURT OF APPEALS
DIVISION II

2014 MAY -6 AM 8:28

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Welfare of | No. 44868-8-II |
| A.B., | |
| STATE OF WASHINGTON, DEPARTMENT OF HEALTH & SOCIAL SERVICES, | |
| Respondent, | |
| v. | |
| E.I., | ORDER GRANTING MOTION TO PUBLISH |
| Appellant. | |

Appellant E.I. moves this court for publication of the unpublished opinion filed on April 1, 2014. The court having reviewed the record and files herein, now, therefore, it is hereby

ORDERED that the final paragraph that reads, "A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered." is deleted. It is further

ORDERED that the opinion will now be published.

DATED this _6th_ day of _May_____, 2014.

_Johanson_, A.C.J.
ACTING CHIEF JUDGE

FILED
COURT OF APPEALS
DIVISION II

2014 APR -1  AM 9: 26

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Welfare of | No. 44868-8-II |
| A.B., | |
| STATE OF WASHINGTON, DEPARTMENT OF HEALTH & SOCIAL SERVICES, | |
| Respondent, | |
| v. | |
| E.I., | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — E.I. is the mother of A.B. The juvenile court terminated E.I.'s parental rights to A.B. based on a finding that E.I. had cognitive impairments that would never allow her to parent A.B. on her own. We agree with E.I. that cognitive impairments alone are not parenting deficiencies, and that the Department of Social and Health Services (DSHS) failed to meet its burden to prove that E.I. is currently unfit to parent A.B. We reverse the juvenile court's order terminating E.I.'s parental rights to A.B. and remand for further proceedings.

FACTS

E.I. and N.B. are the parents of A.B., born February 2011.[1] E.I. also has an older child, J.G., with a different father and who is not the subject of this dependency. In October, the juvenile court found that A.B. was a dependent child under RCW 13.34.030(6)(c). The juvenile court found that N.B.'s criminal history and violent behavior posed a serious risk of harm to A.B. The juvenile court found that E.I. was unable to care for A.B. because she failed to recognize the risk that N.B. posed to the child. A dispositional order was entered in November. Under the dispositional order, E.I. was ordered to participate in the following services: domestic violence (DV) support services through the Young Women's Christian Association (YWCA), a drug and alcohol assessment, individual counseling, a parenting class, and a parenting assessment.

The first dependency review order was entered on February 6, 2012. The dispositional plan remained the same with the exception of the parenting assessment, which the juvenile court changed to a neuropsychological evaluation. According to the review hearing order, the provider for the neuropsychological evaluation was not available until March, and the juvenile court ordered DSHS to attempt to find a provider with earlier appointments. The review hearing order also changed A.B.'s permanency plan from reunification to adoption. Four days later, on February 10, DSHS filed a petition for termination of E.I.'s parental rights. The petition for termination did not identify any specific parenting deficiencies.

---

[1] N.B.'s rights were terminated at the same time as E.I.'s. A commissioner of this court affirmed the order terminating N.B.'s parental rights, and a panel of this court denied his motion to modify the ruling. N.B., therefore, is not a subject of this appeal.

A commissioner of this court also considered E.I.'s appeal on an accelerated basis under RAP 18.13A, then referred the appeal for consideration by a panel of judges.

While the petition for termination was pending, the juvenile court held another dependency review hearing on July 11, 2012. The only services ordered for E.I. were DV support services and a parenting class. By this point in the dependency, E.I. was in the process of separating from N.B. E.I. and N.B. separated permanently in August, 2012. Another review order was entered on January 7, 2013. At this time, the juvenile court ordered E.I. to engage in individual counseling and medication management, and to continue working with a parenting coach. As of the January 7 hearing, the permanency plan listed for A.B. was adoption; reunification was no longer listed as a secondary permanency plan.

The termination fact-finding hearing was held on April 1 and 2, 2013. DSHS presented three witnesses: Dr. Lawrance Majovski, the provider who performed the neuropsychological evaluation; Linda West, E.I.'s parenting coach; and Lisa Sinnett, E.I.'s social worker. E.I. presented testimony from Debby Brockman, E.I.'s DV counselor; and Cory Wetzel, E.I.'s employer. E.I. also testified at the termination fact-finding hearing.

Dr. Majovski testified that he performed a neuropsychological evaluation to evaluate E.I.'s brain behavior and emotional functioning status. He also performed a parenting assessment. Majovski diagnosed E.I. with a cognitive disorder not otherwise specified (cognitive impairment) and impaired intellectual abilities. Majovski noted that E.I.'s parenting strengths were an ability to nurture her children and having a calm demeanor. He also observed that there were no adverse circumstances or safety concerns during the one hour he observed E.I. with her children. When asked what E.I.'s weaknesses were, Majovski responded,

> Limited in her insight, understanding, and decision-making that applies to judgment and reasoning, how you go about making decisions if you had to have one-on-one with one child, as parent to child, much let alone one to two to three or four children.

3

Limited intellectual ability, which affects her cognitive challenges and the impairment we've already discussed, or I have testified, that limit her ability to have insight; reason, to achieve productive solutions to complex challenges; multitasking, decisions you have to make; also affected by comprehension level in reading; also her memory and ability to assimilate a lot of information and hold it, to use that for manipulating data and information to reach productive solutions.

1 Report of Proceedings (RP) at 27. Majovski opined that on a "more probable than not" basis, E.I. would be unable to parent without a coparent, companion, or supportive help. 1 RP at 28. Majovski did not recommend any services for E.I. because he stated that her cognitive impairments were unlikely to change.

West was E.I.'s assigned parenting coach. West worked with E.I. from the end of September 2012 until January 2013. Prior to working with E.I., West received copies of visitation notes and a copy of Dr. Majovski's report. West worked with E.I. for 10 two-hour sessions during the period of time E.I. was referred to services. West's final report was issued on January 21, 2013, 19 days after the January 7 review order in which the juvenile court ordered E.I. to continue working with the parenting coach and approximately two months before the termination trial.

West identified four specific goals for E.I.: (1) understanding normal child development, (2) following a child's lead in play, (3) serving healthy food, and (4) increasing safety. As to her initial concerns about A.B.'s safety, West testified,

Well, I think that one of the concerns was that it was her safety and then keeping him safe through the domestic violence pieces that were happening and that [E.I.] could make good choices for herself and [A.B.].
I didn't feel that there was any concern for his safety during the visits. She was always watching him, and he never did anything dangerous. So it was more around if she had him alone at and things got out of hand.

1 RP at 59. As to her conclusions regarding E.I.'s progress in learning child development, West testified,

4

I think that it would have taken a few -- several more months for her to really get that kids do develop certain ways, you know, emotionally, physically, with language. So I would have had to -- from where I stopped, I'm not really sure she understood that.

1 RP at 64.

One of West's greatest concerns regarding E.I. was that she had to remind E.I. to slow down and let A.B. lead the play. She was also concerned that E.I. asked A.B. too many questions. However, in her final report, West wrote, "On our last visit she did a good job of following [A.B.'s] lead and asking appropriate questions that helped him learn and engage with her." Ex. 9. West also expressed concern about E.I.'s ability to engage A.B. in calming activities such as rocking him or reading. West also believed that E.I. engaged with A.B. more as a playmate than a parent, particularly because West did not observe E.I. say things such as "I'm mama and you're my son" to A.B. during visits. 1 RP at 63.

West testified that by the end of the period of her referral, E.I. was bringing A.B. healthy food at visits and that healthy food was no longer a concern. However, in her report she noted, "[E.I.] was unable to vary much from [the better food choices such as yogurt, rice, chips, gummy treats, and drinks] which maybe [sic] an indication of her lack of creative thinking and problem-solving skills noted in her neuropsychological evaluation." Ex. 9.

Finally, West testified to several concerns she believed existed as to E.I.'s ability to meet A.B.'s needs and provide for his safety. First, she stated that she was concerned because E.I. was originally living alone in an apartment and then had to move back in with her parents. Second, she did not believe that E.I. had the capacity to organize and maintain a routine for A.B. Third, when asked about any concerns regarding E.I.'s ability to protect herself and A.B., West stated she believed that E.I. had a lot of progress to make in keeping herself and A.B. safe

because E.I. was very "wishy-washy" when making a decision about how to deal with the car she shared with N.B. after they separated. 1 RP at 66. Fourth, West believed that E.I. could not manage her time and schedule because she was late to visits on a couple of occasions due to a new work schedule. In her final report, West referenced two additional incidents which concerned her: (1) E.I. once took her older son, J.G., to work with her for a 10-hour shift, and (2) she asked permission to bring A.B. to J.G.'s birthday party which was scheduled for 7 PM. The only safety concern West identified during visits was one occasion when E.I. did not stop A.B. from running with a sucker in his mouth.

West concluded that E.I. would not be able to care for A.B. as a single parent because she was emotionally immature and lacked decision-making and problem-solving skills. Although West testified that E.I. would probably be able to parent with her family's support, she concluded that E.I.'s prognosis for improving her parenting skills was poor.

Sinnett was E.I.'s assigned caseworker at DSHS. Sinnett testified regarding the services provided to E.I. She stated that E.I. engaged in the drug and alcohol assessment, but there were no noted drug or alcohol issues. She also testified that she referred E.I. to individual counseling at the "Center for Child and Family Therapy" but the service ended after three sessions because it was determined that E.I. did not have any clinically significant issues. The first parenting class Sinnett referred E.I. to was "Parenting Children Who Witness Domestic Violence." E.I. attended and completed that parenting class. Then Sinnett referred E.I. to "Nurturing Parenting" which E.I. began to attend and then dropped. Sinnett later referred E.I. to "Love and Logic" at the "Parenting Place." E.I. also completed Love and Logic. Finally, Sinnett referred E.I. to Nurturing Parenting again but E.I. did not attend.

Sinnett stated that E.I. was originally ordered to do a parenting assessment, but that service was later changed to a neuropsychological evaluation. Sinnett changed the recommendation because (1) E.I. exhibited a "[f]lat affect," (2) Sinnett would have to be very concrete and specific when discussing services with E.I., and (3) Sinnett would often have to write down what they discussed verbally so E.I. could refer to it later. 2 RP at 10. Sinnett was also concerned because E.I. would be positively engaged and then have some trouble following through "at other points in time." 2 RP at 14. When Sinnett received the neuropsychological evaluation, she did not refer E.I. to any additional services because there were no additional services recommended in the report. The other service E.I. was ordered to engage in was DV support services. E.I. was referred to the YWCA "ALIVE" DV program and began working with Brockman, an individual DV advocate.

On cross-examination, Sinnett stated that she had no idea what other services might help E.I. E.I. asked Sinnett about additional hands-on parenting programs and Sinnett stated that parent-child interaction therapy and "Safe Care" were at least two additional hands-on parenting services. Sinnett did not refer E.I. to either service because she had referred her to hands-on parenting coaching with West. However she did acknowledge that "Safe Care" could have been appropriate.

Sinnett also supervised some of the visits between E.I. and A.B. During her testimony the only negative incident Sinnett testified about was that on one occasion A.B. was coloring by scribbling with crayons and markers. E.I. tried to get him to color a picture and told him the fire truck should be red. Sinnett testified that this incident demonstrated that E.I. was demanding of A.B. beyond his developmental capability.

7

Sinnett also testified that A.B. was doing very well and meeting all of his developmental milestones. She opined that there was little likelihood E.I. would be able to remedy her parental deficiencies. And she testified that there were no adoption resources identified for A.B. and that the only identified potential placement being considered by DSHS was placement with one of A.B.'s paternal relatives. Sinnett opined that termination was in A.B.'s best interests.

Brockman testified regarding her work with E.I. during the dependency. Brockman began working one-on-one with E.I. after she received the referral from DSHS in December 2011, but E.I. had already been attending support groups through the program. Initially, Brockman worked with E.I. on recognizing patterns of abusive relationships, identifying healthy relationships, and safety planning. During her work with E.I., Brockman never observed E.I. to be cognitively impaired nor did she observe any difficulty with E.I.'s comprehension of the topics they were discussing. Over time, Brockman observed E.I. make significant progress in understanding the harm of her relationship with N.B. Brockman also commended E.I.'s decision to separate from N.B. and make the conscious decision to maintain that separation. Brockman also testified that E.I. had decided not to enter into any relationships and to continue working with Brockman on identifying warning signs and unhealthy behavior so she would be safe if she entered into a new relationship in the future.

Brockman explained the circumstances surrounding the car that concerned West. Brockman stated that the car was registered in E.I.'s name but it was used by N.B. E.I. retrieved the car from impound when N.B. was arrested and used the car while N.B. was incarcerated. Although the car was helpful to her in managing her schedule, E.I. felt uncomfortable keeping the car, so she returned the car to N.B.'s mother. After she returned the car, E.I. was able to purchase a vehicle of her own.

Brockman also testified regarding West's concern that E.I. brought J.G. to work with her during a 10-hour shift at a galley on a Navy base. Contrary to West's understanding, E.I. had J.G. with her during a day off when E.I.'s boss called her and asked if she could cover for some people who had not shown up at work. E.I. made sure that it was acceptable to bring J.G. and that there was a safe place for him to stay while she worked. There was an office with a Naval officer present where J.G. could watch television or videos, so E.I. brought him to work with her. E.I.'s boss was able to relieve her after approximately two hours.

Brockman noted that E.I. also had unsupervised visitation with J.G. Although J.G.'s father was the primary residential parent, E.I. was able to take J.G. places unsupervised and sometimes J.G. spent nights at E.I.'s home.

In addition, Brockman testified regarding E.I.'s housing situation. She explained that when E.I. originally separated from N.B., she was living in an apartment that was paid for based on their combined incomes. When she was living alone, she could no longer afford the apartment and bills on her individual income. During the same period, E.I. was briefly furloughed from her job and without steady income she was unable to obtain housing assistance. Due to her financial situation, E.I. chose to move in with her parents. Brockman testified that she had visited the apartment at the time E.I. was living alone and the apartment was well taken care of and E.I. did not appear to have any problem living on her own. It was only E.I.'s financial situation at the time, primarily a result of her decision to end her abusive relationship with N.B., which caused her to leave the apartment and move in with her parents. Brockman also observed that E.I. was very self-sufficient in pursuing resources that may offer her housing assistance and was resourceful enough to seek out that assistance on her own.

E.I.'s supervisor, Wetzel, testified regarding E.I.'s employment. E.I. began as a food service worker in the Navy galley, but she was promoted to a lead position. As a lead, E.I. opened or closed the galley when Wetzel was not there. Wetzel explained that at one point, due to lack of work, they shut down one of the galleys and E.I. was laid off. However, Wetzel immediately hired E.I. back when the galley reopened. Wetzel also testified that E.I. was such a valuable employee that Wetzel was able to maintain her employment even though they had to later lay off other employees again.

Wetzel characterized E.I.'s work as outstanding. She noted that E.I. was very punctual and managed her changing schedule. Wetzel also testified that E.I. was promoted to lead because she had been able to learn every area of the galley including the cash register and helping with the cash management. E.I. was able to multitask, address problems as they came up, manage all her tasks efficiently, and handle the stress of high-capacity, busy days. E.I. was also able to manage inspections in the galley and perform additional tasks related to inventory and ordering.

Wetzel also clarified the circumstances regarding the day that J.G. came to work with E.I. Wetzel had asked E.I. to come in, and E.I. stated she had J.G. with her. Wetzel told her that there was an office with a television and videos where J.G. would be supervised by the Navy watchman. Wetzel also told her that it would be for approximately two hours. Because there was a safe place for J.G. and she would only be working for a couple of hours, E.I. came to work to fill in for Wetzel until Wetzel could relieve her.

In addition to observing E.I.'s work first hand, Wetzel also supervised several employees with disabilities, including people with learning disabilities. Based on her experience working

with people with learning disabilities, Wetzel did not believe that E.I. had a learning disability that impeded her ability to function independently.

E.I. introduced many reports created by the visit supervisors. According to the visitation notes, the visits between E.I. and A.B. were positive. E.I. played with A.B. on push cars, bikes, and wagons. They colored and played with Play-Doh. E.I. talked to A.B., asked him questions, and helped him identify lots of toys with words. A.B. clearly liked cars, so E.I. often picked him up and held him so he could look out the window and watch the cars drive by. E.I. responded to A.B.'s cues such as fussing or acting tired, and she was able to redirect any inappropriate behavior. The visitation reports demonstrate that E.I. regularly responded to safety concerns appropriately. Neither of the incidents that West or Sinnett identified as problematic was in the visitation reports submitted into evidence.

E.I. testified that it was a hard decision for her to leave N.B. because they were a family but it was a positive decision. E.I. also explained that she and Brockman had developed a safety plan so E.I. knew exactly what to do if N.B. became a danger to her or her children. E.I. testified that she currently lived with her parents for financial reasons but when she was able to, she would seek her own apartment. She also stated that her parents were a good resource and support for her, as well as her best friend who also had children. When asked what she would do if the termination petition was dismissed and the dependency continued, E.I. responded,

> My plan is for my child to be home and returned to me and at least give me the chance to work in-home dependency; because obviously since I've been working with them for these past two years or whatnot, obviously they must not know who I am and what I'm capable of, what I'm capable of doing, or what I can do for myself and my child.

2 RP at 94. E.I. also agreed she would continue participating in services if necessary.

11

A.B.'s court-appointed special advocate (CASA) stated that she believed E.I.'s parenting deficiencies were difficulty making decisions and perceiving the needs of a child at different ages. The CASA stated that she believed termination was in A.B.'s best interests. She also noted that DSHS was investigating a placement with a paternal relative.

At the conclusion of the fact-finding hearing, the juvenile court made an oral ruling terminating E.I.'s parental rights as to A.B. The juvenile court stated, "[I]t literally makes me sick to have to terminate her parental rights because she's a kind, good, sweet person who has neurological deficits, the type of thing that can't be really cured by a course of therapy." 2 RP at 175-76. The juvenile court specifically found that E.I.'s witnesses testified "truthfully and accurately," but that E.I.'s cognitive impairments resulted in a lack of judgment and insight as it related to the subtle needs of children. 2 RP at 176.

The juvenile court also entered written findings of fact and conclusions of law. The juvenile court found E.I. to be currently unfit because her cognitive impairments prevented her from making intuitive judgments, grasping child development, perceiving subtle dangers to children, understanding the impact of things on children, or communicating effectively with her child. The juvenile court also found that there were no services that could be offered to E.I. because her cognitive impairments could not be changed. The juvenile court concluded that DSHS proved the statutory requirements for termination by clear, cogent, and convincing evidence, and that termination was in the best interests of the child. The juvenile court entered an order terminating E.I.'s parental rights to A.B. E.I. appeals.

ANALYSIS

E.I. argues that the juvenile court erred by finding that DSHS proved all the statutorily required factors for termination by clear, cogent, and convincing evidence. Specifically, she argues that DSHS failed to prove (1) that all necessary services reasonably capable of correcting her parenting deficiencies were expressly and understandably offered or provided, (2) that she was currently unfit to parent A.B., (3) that there was little likelihood that conditions would be remedied such that A.B. could be returned to E.I. in the near future, and (4) that continuation of the parent and child relationship clearly diminished A.B.'s prospects for early integration into a stable and permanent home. Because we hold that DSHS failed to meet its burden to prove that E.I. was currently unfit to parent A.B., we do not address the remaining issues E.I. raises on appeal.

The juvenile court may terminate a parent's rights as to his or her child if DSHS establishes by clear, cogent, and convincing evidence that the parent is currently unfit. *In re Welfare of A.B.*, 168 Wn.2d 908, 925, 232 P.3d 1104 (2010). The juvenile court must also find that DSHS has proven six factors by clear, cogent, and convincing evidence:

> (a) [t]hat the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned

to the parent in the near future. The presumption shall not arise unless [DSHS] makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided[; and]

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

Former RCW 13.34.180(1)(a)-(f) (2009); *A.B.*, 168 Wn.2d at 911. Then, DSHS must prove by a preponderance of the evidence that termination of parental rights is in the child's best interests. RCW 13.34.190(1)(b).

Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown to be "'highly probable.'" *In re Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) (quoting *Supove v. Densmoor*, 225 Or. 365, 372, 358 P.2d 510 (1961)). We will not disturb the juvenile court's findings of fact if they are supported by substantial evidence. *Sego*, 82 Wn.2d at 739. Substantial evidence is evidence sufficient to persuade a fair-minded rational person of the truth of the declared premise. *Bering v. SHARE*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986), *cert. dismissed*, 479 U.S. 1050 (1987). "[E]vidence that may be sufficiently 'substantial' to support an ultimate fact in issue based upon a 'preponderance of the evidence' may not be sufficient to support an ultimate fact in issue, proof of which must be established by clear, cogent and convincing evidence." *Sego*, 82 Wn.2d at 739 (footnote omitted). We do not make credibility determinations or weigh evidence. *Sego*, 82 Wn.2d at 739-40.

CURRENT UNFITNESS

Identifying parenting deficiencies is not the equivalent of proving parental unfitness. *In re Dependency of Schermer*, 161 Wn.2d 927, 943, 169 P.3d 452 (2007) (citing *In re Welfare of KK*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992), *cert. denied*, 507 U.S. 927 (1993)). A dependency determination requires a showing of parental deficiency by a mere preponderance of

No. 44868-8-II

the evidence. *Schermer*, 161 Wn.2d at 942. Under RCW 13.34.030(6), a child is a dependent child if the child

(a) [h]as been abandoned;
(b) Is abused or neglected . . .;
(c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

Dependencies are subject to a "relatively lenient preponderance standard" because dependencies serve "the important function of allowing state intervention in order to remedy family problems and provide needed services." *Schermer*, 161 Wn.2d at 942. A dependency finding under RCW 13.34.030(6)(c) need not be based on proof of actual harm, but instead can rely on a danger of harm to the child. *Schermer*, 161 Wn.2d at 951. A juvenile court has broad discretion in determining when there exists a risk of harm. *Schermer*, 161 Wn.2d at 951.

But "[a] dependency proceeding and a termination proceeding have different objectives, statutory requirements, and safeguards." *KK*, 119 Wn.2d at 609 (citing *In re Hiebert*, 28 Wn. App. 905, 908, 627 P.2d 551 (1981)). While identifying parenting deficiencies is sufficient to support a dependency, it is unconstitutional to permanently terminate a parent's rights without a finding of unfitness. *KK*, 119 Wn.2d at 609. Further, DSHS is held to the higher burden of proving current unfitness in a termination proceeding by clear, cogent, and convincing evidence, rather than the more lenient preponderance of the evidence standard applied in dependency proceedings. RCW 13.34.190(1)(a)(i).

Therefore, a finding of current unfitness requires more than the determination that DSHS has proved, by a preponderance of the evidence, that a parenting deficiency exists, as in a dependency proceeding. *See* RCW 13.34.030(6); *Schermer*, 161 Wn.2d at 943. To meet its burden to prove current unfitness in a termination proceeding, DSHS is required to prove that the

15

parent's parenting deficiencies prevent the parent from providing the child with "basic nurture, health, or safety" by clear, cogent, and convincing evidence. *See* RCW 13.34.020; *see also generally* former RCW 13.34.180(1)(e)(ii) (parent has a condition that "render[s] the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child").[2]

Here, the juvenile court made the following factual finding regarding the parenting deficiencies that rendered E.I. currently unfit:

> [E.I.] has neurological and cognitive deficits that do not allow her parent to [sic] the child. Because of these deficits, she cannot make the intuitive judgments that parents have to make. She is not able to grasp child development, and while she is able to perceive obvious dangers to herself, she is unable to perceive the subtle dangers that impact children. She cannot understand the impact and effect things have on children, or communicate effectively with the child.

Clerk's Papers at 57. The trial court relied on this finding to conclude that DSHS had met its burden to prove that E.I. was currently unfit to parent A.B. The juvenile court's findings of fact are not supported by evidence substantial enough to support the conclusion that the DSHS met its burden to prove current unfitness by clear, cogent, and convincing evidence.

---

[2] We also note that the third party custody statutes place "a high threshold burden on a petitioner seeking nonparental custody." *In re Custody of B.M.H.*, 179 Wn.2d 224, 235-36, 315 P.3d 470 (2013). To meet this heightened standard, a party seeking to interfere with a parent's liberty interest in the custody of her children must show that the parent is either unfit or custody with the parent would result in actual detriment to the child's growth and development. *B.M.H.*, 179 Wn.2d at 235. For the purposes of nonparental custody, our Supreme Court has stated, "A parent is unfit if he or she cannot meet a child's basic needs." *B.M.H.*, 179 Wn.2d at 236 (citing RCW 26.44.010); *see also generally In re Aschauer*, 93 Wn.2d 689, 694, 611 P.2d 1245 (1980) ("[the mother] lacks the necessary capacity for giving parental care").

E.I.'s parenting deficiencies, as identified in the dependency order, were all related to the DV in her relationship with N.B. By the time of the termination hearing, E.I. had remedied the parenting deficiencies related to DV by removing herself from her relationship with N.B., understanding the need for maintaining the separation, deciding not to enter into new relationships, learning the characteristics and harms of DV relationships, and completing all her DV-related services. The juvenile court recognized that E.I. had the ability to understand how to cease being the victim of DV but somehow believed that she was unable to understand how DV affected her child. The juvenile court reiterated this concern in its written finding regarding E.I.'s inability to perceive subtle dangers and the impact of "things" on children. The evidence presented in this case is not sufficient to persuade a fair-minded, rational person that E.I. is unable to perceive the dangers that DV poses to her child.

There is also insufficient evidence to support the juvenile court's finding that E.I. was unable to communicate effectively with A.B. West testified that sometimes she felt that E.I. asked A.B. too many questions during play, but there is also ample evidence that E.I. interacted with A.B. on an age-appropriate level and was able to teach him words through identifying toys and objects. There was no evidence that asking A.B. too many questions during play prevents E.I. from effectively communicating with him. Sufficient evidence does not support the juvenile court's finding that E.I. is unable to effectively communicate with A.B.

There were some minor safety concerns that were articulated by West and Sinnett such as the incident involving A.B. running with the lollipop. West also testified that E.I. had not learned a sufficient amount about child development. Therefore, there is sufficient evidence to

support the finding that E.I. has parenting deficiencies related to a lack of understanding of childhood development and trouble identifying some subtle dangers to children.

However, there is insufficient evidence to support the trial court's finding that E.I. lacks intuitive judgment and decision-making skills. Although West testified that she was concerned about E.I.'s decision-making ability based on a misunderstanding regarding the shared car, Brockman explained that E.I. had concerns about keeping the car, made a clear decision about what to do with the car (give it to N.B.'s mother), and then proceeded to buy a car on her own. The juvenile court explicitly found that Brockman testified truthfully. Therefore, we conclude that the trial court's finding regarding day-to-day decision-making ability is not supported by sufficient evidence.

West and Sinnett expressed concern about E.I.'s judgment and decision-making skills because they believed she was unable to live independently, and the juvenile court relied on these opinions in its findings of fact. West's and Sinnett's opinions were based solely on the fact that E.I. moved in with her parents. However, Brockman's credible testimony established that E.I. was able to live on her own, but because she made the decision to leave her abusive relationship, she did not have the financial resources to continue living in the apartment that she had previously shared with N.B. Brockman also testified that E.I. was very proactive about trying to reestablish an independent living situation by seeking out housing resources. Accordingly, a fair-minded person could not conclude that E.I. lacked judgment or decision-making skills based exclusively on E.I.'s living situation, and substantial evidence does not support the juvenile court's findings that E.I. is incapable of adequate judgment or decision making.

Substantial evidence supports the juvenile court's finding that E.I.'s cognitive impairments resulted in a lack of understanding of child development stages and difficulty identifying certain subtle dangers. Therefore, DSHS identified parenting deficiencies that create a *risk* of harm that warrants intervention and participation in services. However, the findings of fact do not show that DSHS proved that E.I. was unfit by clear, cogent, and convincing evidence.

DSHS was required to prove that it is "highly probable" that E.I.'s cognitive impairments rendered her incapable of meeting A.B.'s basic needs. Here, there were never any serious safety concerns regarding E.I.'s care of A.B. A.B. was removed from the home due to the safety risk posed by N.B.'s abusive behavior. E.I. removed this risk to A.B.'s safety by leaving her relationship with N.B. The evidence also showed that E.I. was able to provide healthy food for A.B., and E.I. was able to maintain a safe home both on her own and with her parents. Although E.I.'s cognitive impairments may pose a risk of harm to A.B due to an inability to identify subtle dangers for the purpose of establishing a dependency based on these concerns, it is not highly probable that A.B. will be harmed by E.I.'s inability to recognize *subtle* safety risks or that E.I. would be unable to provide for his basic needs. Therefore, DSHS did not meet its burden to prove that E.I.'s cognitive impairments render her unfit to parent for the purpose of permanently terminating her parental rights to A.B.

Here, E.I.'s cognitive impairments impacted her ability to parent because they interfered with her ability to understand child development and identify subtle safety risks to her child. Cognitive impairments that result in a parent having difficulty learning specific aspects of parenting but that do not present an immediate or severe risk to the child's safety are not sufficient to render a parent currently unfit. Therefore, the juvenile court erred by concluding that DSHS met its burden to prove that E.I. was currently unfit by clear, cogent, and convincing

evidence. Because DSHS failed to meet its burden to prove that E.I. is currently unfit, the juvenile court's order terminating E.I.'s parental rights as to A.B. is reversed.

Although we do not address E.I.'s remaining claims regarding whether DSHS met its burden to prove that all necessary services were offered or provided or there was little likelihood conditions could be remedied in the near future, we note that the juvenile court relied heavily on Majovski's testimony that E.I.'s cognitive impairments could not be corrected. However, the juvenile court's focus was misplaced. In *In re Dependency of T.L.G.*, 126 Wn. App. 181, 203, 108 P.3d 156 (2005), the court held that mental illness alone is not proof that a parent is unfit or incapable. "The court must examine the relationship between the mental condition and parenting ability." *T.L.G.*, 126 Wn. App. at 203. The same is true of cognitive impairment. Because the existence of cognitive impairments is not proof that a parent is unfit unless the cognitive impairment directly impacts the ability to parent, the question is whether the resulting parenting deficiencies can be corrected. *See In re Dependency of T.R.*, 108 Wn. App. 149, 165, 29 P.3d 1275 (2001). In other words, the proper inquiry for the juvenile court is whether the parenting deficiencies resulting from cognitive impairments can be remedied, and whether services can be offered or provided that may remedy the parenting deficiencies. At times, such as with some mental illnesses, services may be directed toward remedying both the underlying cause of the parenting deficiencies in addition to the parenting deficiencies themselves. However, even when the underlying cause of the parenting deficiency cannot be remedied, the juvenile court must determine whether services were offered to remedy the resulting parenting deficiencies and whether there is a likelihood that the resulting parenting deficiencies can be remedied in the near future. Former RCW 13.34.180(1)(d), (1)(e).

20

No. 44868-8-II

The juvenile court's order terminating E.I.'s parental rights as to A.B. is reversed because DSHS failed to meet its burden to prove that E.I. was currently unfit. We remand to the juvenile court for further proceedings consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

WORSWICK, C.J.

LEE, J.

21