IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of: | ) | No. 36948-0-III |
| | ) | (consolidated w/ |
| X.S. | ) | No. 36949-8-III) |
| | ) | |
| _____ | ) | |
| | ) | |
| In the Matter of the Dependency of: | ) | UNPUBLISHED OPINION |
| | ) | |
| X.W. | ) | |

FEARING, J. — John Smith appeals from the termination of his parental rights to his two daughters. We affirm.

FACTS

We take the facts from trial testimony and exhibits admitted during the termination trial. John Smith and Connie Williams are the biological parents of two young girls, Carrie, born April 10, 2016, and Jane, born October 16, 2017. All four names are pseudonyms. Carrie tested positive for opiates at birth due to Williams's heroin use throughout her pregnancy. On April 12, 2016, the Department of Social and Health Services, now the Department of Children, Youth, and Families (DCYF), filed a dependency petition for Carrie.

In late April 2016, Connie Williams burglarized John Smith's home after a domestic violence incident between the two. Thereafter a court entered an order prohibiting contact between Williams and Smith. In May 2016, DCYF placed Carrie with Connie Williams at Isabella House, where Williams received inpatient chemical dependency treatment and mental health, parenting, and domestic violence services.

Pursuant to the dependency in Carrie's case, mental health therapist Steven Erickson provided counseling and cognitive behavioral therapy for John Smith from April 2016 until Erickson's retirement in December 2016. Erickson, in part, addressed Smith's history of trauma and anxiety. Erickson sought to help Smith establish boundaries, improve his ability to employ impulse control, and establish trust in interpersonal relationships.

Amanda Clemons provided John Smith family therapy from April 2016 to May 2018. Clemons counseled Smith on the need for boundaries with Connie Williams and the importance of Smith protecting his children. According to Clemons, Smith repeatedly denied the truth of adverse information. When confronted with increasingly definitive and contradictory information, Smith admitted the truth, but blamed others for his faults. Smith blamed others when confronted with the presence of Williams in his

home, improperly using a car seat, and administering corporal punishment on his daughters. Smith continually identified himself as a victim of Williams's behavior.

On November 21, 2016, after Connie Williams successfully completed a chemical dependency treatment program, the court dismissed Carrie's dependency case.

On December 7, 2016, an Attorney General's office employee saw Connie Williams at a grocery store with one of John Smith's older children, John Jr., who was in Smith's care. On December 8, an unidentified individual saw Williams's black Honda at Smith's residence. When confronted with this information, Smith denied any contact with Williams. He later admitted that Williams resided at his house despite her continued substance abuse and the no contact order.

On Christmas Day 2016, law enforcement responded to John Smith's home based on a report of domestic violence. Smith and Connie Williams each accused, in the hearing of officers, the other of using drugs.

On December 30, 2016, DCYF filed a second dependency petition as to Carrie following allegations of drug use, domestic violence between Connie Williams and John Smith, and the parents' failure to maintain boundaries with each other. On January 13, 2017, the dependency court held a shelter care hearing and ordered Carrie placed in foster care. The court found that illicit drugs were present in the homes of both Williams and

Smith and that neither parent had been honest with the court. The court also found that Smith's lack of impulse control and poor judgment contributed to domestic violence. Thereafter, DCYF referred Smith for family therapy and mental health counseling. DCYF also ordered Smith to submit to random urinalysis and blood alcohol testing. The court entered another injunction against contact between Smith and Williams.

Mental health and chemical dependency counselor Carla Paullin counseled John Smith after Steven Erickson's retirement in December 2016. At DCYF's request, Paullin focused on Smith's violent behavior. Paullin and Smith worked on Smith's emotional regulation, manipulation of others, control of others, codependency, and boundary setting in relationships. The counselor and patient discussed Smith's self-centered nature and unstable personality features.

In a March 16, 2017 order, the dependency court recognized the ultimate goal of reunification between John Smith and daughter Carrie. The court ordered the following services for Smith: a parenting and attachment assessment, intensified individual mental health sessions, and urinalysis only on reasonable suspicion.

In a March 2017 report, counselor Carla Paullin noted she could not trust John Smith to be honest and to make good decisions. In an April 2017 report, Paullin also wrote that Smith was being controlling and manipulative in regard to his relationship with

Connie Williams. Paullin tried to assist Smith to understand that he does not have the power to control Williams's behaviors.

John Smith completed a domestic violence evaluation in March 2017 by Tapio Counseling. During the evaluation, Smith admitted to driving dangerously with Connie Williams in the car, swearing at her, refusing to talk to her, issuing commands to her, spying on her, and giving her money only after she begged. The evaluator recommended that Smith participate in one year of domestic violence perpetrator treatment.

John Smith initiated a domestic violence perpetrator treatment program with counselor Elizabeth Rief. According to Rief, Smith often failed to appear for treatment in part because of time spent with Connie Williams. Smith soon ceased treatment.

Mental health counselor Linda Wirtz performed a parenting assessment of John Smith with Carrie in April 2017. Wirtz evaluated Smith as possessing good parenting skills and observed a bonded relationship between Carrie and Smith. Carrie felt secure and happy with her father. Smith responded to Carrie's cues for a bottle, a diaper change, and a nap.

On May 30, 2017, John Smith moved the court for an order to place Carrie in his care. In an order denying the motion, the court commissioner found that Smith withheld the truth and impulsively made false statements only to attempt to correct them later. The

commissioner also found that Connie Williams and Smith violated court orders by seeing each other. The court, nonetheless, recognized that Smith possessed the capacity to parent and render sound decisions about discipline. Smith also could provide food and clothing for Carrie. The court ordered monitored in-home visits.

By September 2017, counselor Carla Paullin supported transitioning Carrie to John Smith's care, because Smith never missed an appointment, he always showed care for his children, and he consistently asked what more could he do.

On October 16, 2017, Connie Williams gave birth to Jane. Although the dependency court had ordered Williams and John Smith to refrain from contact with one another, the paternity results deemed Smith to be Jane's father. After Jane's birth, counselor Carla Paullin grew concerned that Smith could not distance himself from the chaos and drama that his relationship with Williams caused.

On November 3, 2017, DCYF filed a dependency petition as to Jane because Connie Williams admitted to heroin use during the pregnancy and Jane showed signs of withdrawal from the drug. Jane required medical care for thirty days, and health care providers administered Jane morphine while she weaned off heroin. The dependency petition alleged that John Smith placed Jane at risk of harm because of his history of domestic violence with Williams and his lack of transparency with DCYF.

After a November 20, 2017, contested shelter care hearing, the dependency court released Jane to John Smith so long as he provided a negative full-panel urinalysis and complied with all service requirements and conditions of previous court orders in his dependency cases for Carrie and two older children. The shelter care hearing order enjoined John Smith from any contact with Connie Williams, either directly or through third parties. Thereafter, DCYF developed a plan with Smith, which listed steps he should take if Williams tried to contact him.

In January 2018, a visitation supervisor from Love My Child conducted an in-home visit of John Smith and Jane. The supervisor saw female hygiene products and clothing in Smith's residence. When confronted with this information, Smith denied any contact with Connie Williams and claimed the female items belonged to his oldest child.

On January 27, 2018, family therapist Amanda Clemons and Jane's guardian ad litem Crystal Ruiz entered, without earlier warning, John Smith's home. The two found Connie Williams hiding under a pile of laundry. Because of the parents' contact, DCYF removed Jane from Smith's care and placed the infant in shelter care.

On January 31, 2018, Laura Signorino, the DCYF social worker for both dependency cases, asked John Smith to submit a hair follicle test. Smith's hair was too short to produce an adequate sample.

At a February 2, 2018, permanency planning hearing for Carrie, the dependency court changed Carrie's primary placement plan to adoption. The court based this change on John Smith's lack of progress and transparency with DCYF. The court found that Smith failed to set boundaries with Connie Williams and failed to keep his children safe. The court emphasized Williams's continued drug use, the toxic relationship between Smith and Williams, and the couple's continued contact that violated court orders.

On March 23, 2018, the dependency court entered an agreed order of dependency and order of disposition for Jane. The disposition and subsequent review orders required Smith to submit to a hair follicle test, submit to random urinalysis, obtain a mental health assessment, follow the recommendations of the mental health assessment, engage in anger management and domestic violence prevention services, participate in family therapy, and obtain a chemical dependency assessment.

Thereafter, John Smith submitted a hair follicle for testing. The sample tested positive for heroin, cocaine, and methamphetamine. Smith denied the positive results of a hair follicle test to family therapist Amanda Clemons. In April 2018, John Smith began chemical dependency treatment at Spokane Addiction Recovery Center (SPARC).

In April 2018, social worker Laura Signorino observed text messages exchanged between Connie Williams and John Smith.

PROCEDURE

On April 25, 2018, DCYF filed a petition to terminate John Smith's and Connie Williams's parental rights to Carrie. On May 16, 2018, Smith and Williams married one another despite the ban on any contact.

In May 2018, therapist Amanda Clemons discharged John Smith from family therapy. Clemons concluded that Smith knew all of the strategies to make appropriate decisions and to protect his children, but that he refused to implement those tactics. On July 6, 2018, the dependency court relieved DCYF of the obligation to provide family counseling to John Smith.

In May 2018, John Smith reinitiated his domestic violence perpetrator treatment program with counselor Elizabeth Rief. Smith made some progress through the treatment.

In July 2018, law enforcement arrested John Smith for allegedly striking Connie Williams several times on a public street. Williams suffered a swollen right eyebrow and a scratch on the back of her triceps. Williams denied the injuries and refused to be photographed. Smith later pled guilty to assault.

After the July 2018 domestic violence incident, John Smith read a book on codependency. According to counselor Carla Paullin, after Smith read the book, Smith demonstrated some understanding of codependency.

In July 2018, John Smith successfully completed his drug addiction treatment program at SPARC.

Michelle Druktenis supervised visits between John Smith and his daughters from August 2018 to February 2019. Smith visited the girls three times a week for three hours per visit in Smith's home, at Druktenis' office, or in public settings. Druktenis noted no safety concerns at Smith's home. According to Druktenis, oldest daughter Carrie showed more affection toward Smith. Carrie hugged and kissed her father. Carrie asked for daddy when Druktenis retrieved her from daycare. Because of her infancy, Jane expressed little affection toward her father, other than sitting on his lap and giving him hugs.

On October 16, 2018, DCYF filed a second petition to terminate the parents' rights to Jane. On January 15, 2019, one of the girls' foster parents observed John Smith's attempt to give Connie Williams a ride in his vehicle. Smith sped away when seen.

John Smith's progress in the domestic violence perpetrator treatment program ended with a positive hair follicle test in November 2018, and with contact with Connie

Williams in January 2019. Both events violated Smith's conditions of treatment.

John Smith restarted substance abuse treatment at SPARC in January 2019. According to his chemical dependency treatment provider Damien Miller, Smith complied with the program for the two months leading up to trial in March. Miller believed Smith would complete his treatment in April 2019.

Both termination cases proceeded to trial in March 2019. At the time of trial, Carrie was three years old and Jane was one and one-half years old. Connie Williams did not attend trial.

During the termination trial, many professionals testified about the forbidden contact between the parents. The testimony showed that John Smith and Connie Williams maintained continual contact with each other despite orders banning the interaction.

John Smith's former mental health therapist, Steven Erickson, testified at trial. Erickson testified that Smith's misbehavior related to his lack of impulse control. Erickson complimented Smith's ability to positively interact with his children during their meetings. Erickson could not testify about Smith's and Connie Williams's relationship because neither Smith nor DCYF gave Erickson any information regarding the relationship. Erickson concluded that Smith satisfactorily progressed with Erickson's treatment, although Smith could still improve on establishing boundaries.

Mental health and chemical dependency counselor Carla Paullin testified. Paullin expressed surprise that John Smith's March 2018 hair follicle test scored positive for cocaine, heroin, and methamphetamine. She also expressed concern that Smith was not honest with her about the test results. Paullin acknowledged that substance abuse by a parent negatively affects children and may cause problems with placing Carrie and Jane in Smith's care. According to Paullin, Smith's prognosis is guarded because of his continued contact with Connie Williams. Smith knows his relationship with Williams is toxic, yet he continues to see her. Paullin testified that, if Smith wants to parent Carrie and Jane, he needs to work on impulsivity, boundaries, and transparency. Paullin testified that domestic violence in the home is the number one source of trauma on children. Paullin wishes Smith to forego contact with Williams for one year before either daughter returns to Smith's home.

Family therapist Amanda Clemons also testified. Clemons opined that Smith's willingness to allow his daughters to spend time with Connie Williams, someone consistently under the influence of drugs, harms the girls and endangers their safety. Clemons added that John Smith lacked insight into how his repeatedly engaging in unhealthy relationships, acting impulsively, and lack of honesty with his providers

harmed his children. Clemons could not support placement of Carrie and Jane with Smith.

Elizabeth Rief, John Smith's domestic violence perpetrator treatment program counselor, testified that John Smith did not successfully complete the program. Mental health counselor Linda Wirtz testified that Smith posed a low risk of danger to his daughter, Carrie.

DCYF social worker Laura Signorino testified that John Smith complied with most services, but he failed to progress as a result of the services. Signorino opined that Smith had not corrected his parental deficiencies. According to Signorino, DCYF continued to worry about Smith's lack of boundaries with Connie Williams, his lack of transparency, his assaults on Williams, his illicit drug use, and his lack of insight into his deficiencies. The domestic violence and drug abuse substantially impacted Smith's ability to protect and care for his daughters. Otherwise, Smith possessed basic parenting skills. Laura Signorino opined that continuing the parent-child relationship between Smith and his daughters may confuse the girls and hinder their ability to transition to a permanent home.

Guardian ad litem Crystal Ruiz testified that, as of March 5, 2019, Carrie and Jane thrived in their respective home placements. She explained that, although the girls resided in different homes, the families met together and the girls had play dates.

According to Ruiz, both girls deserved permanency and a chance for a stable life. Despite Carrie's attachment to Smith, Ruiz did not recommend continued contact between Smith and either of his daughters.

John Smith testified at the termination trial that he learned from the services provided by DCYF. He explained that domestic violence is not only physical, but can be financial and emotional. He learned about codependency with Connie Williams and how the phenomena influenced his behavior. He learned that heroin is more addictive than cocaine or alcohol. Smith still denied any assaultive behavior.

John Smith testified he went long periods of time without contact with Connie Williams. He did not quantify the time. Smith claimed that Williams occasionally called DCYF and asserted false allegations against him because he refused contact with her. Smith acknowledged that Williams was pregnant again and he might be the biological father.

John Smith testified that he would no longer pursue a relationship with Connie Williams because she has chosen heroin over her own children. Smith acknowledged his marriage to Williams in May 2018, but insisted he had filed for divorce.

The trial court terminated John Smith's and Connie Williams' parental rights to Carrie and Jane. The court entered the following findings of fact:

There is little likelihood that conditions will be remedied so that the children can be returned to the parent(s) in the near future.

. . . .

The father, Mr. [Smith], had periods of both compliance and noncompliance with most of his services. However, ultimately, Mr. [Smith] has failed to apply the advice provided to him in services to his own life and to the decisions he makes regarding his children's safety.

. . . .

. . . Ms. Paullin stopped counseling with Mr. [Smith] after two years because she felt she had done all she could—he was not applying the techniques provided in counseling to his life, and any future change would be up to him.

. . . .

It is in the children's best interests to terminate the parent-child relationship. Ms. [Williams] has never remedied her drug issue. Mr. [Smith] has not demonstrated that he can put the children first and stay away from Ms. [Williams]. The relationship between the two parents poses a risk to the children as it has domestic violence threaded through it. It is unhealthy for these children to continue to be exposed to domestic violence and drug use. Each of the children [has] had multiple placements during the dependency, it is critical for healthy growth and development that they have stable, permanent homes with consistent caregivers.

Clerk's Papers at 416-20. The court also found John Smith currently unfit to parent his children.

LAW AND ANALYSIS

On appeal, John Smith challenges the sufficiency of evidence to terminate his parental rights to Carrie and Jane. He contends that substantial evidence did not support (1) a finding of little likelihood that conditions would be remedied so that Carrie and Jane could be returned to him in the near future, (2) that his continued relationship with the

15

daughters diminished their prospects for permanency, (3) that termination of his parental

rights served Carrie and Jane's best interests, and (4) that he was an unfit parent.

*Issue 1: Whether substantial evidence supports the trial court finding of little*

*likelihood that John Smith would remedy his deficiencies so that Carrie and Jane could*

*be returned to him in the near future?*

*Answer 1: Yes.*

In order to terminate the parent-child relationship, the State must satisfy a two-

prong test. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576, 257 P.3d 522 (2011).

The first prong requires proof of six elements listed in RCW 13.34.180(1). *In re*

*Dependency of K.N.J.*, 171 Wn.2d at 576. These six statutory elements are:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .; and
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

16

RCW 13.34.180(1)(a)-(f). The State must prove each element by clear, cogent, and convincing evidence before terminating parental rights. RCW 13.34.190(1)(a)(i). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown to be "'highly probable.'" *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

Second, the State must show a termination order serves the best interests of the child. RCW 13.34.190(1)(b). The trial court must find by a preponderance of the evidence that termination furthers the best interests of the child. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

This reviewing court must uphold the trial court's factual findings if supported by substantial evidence. *In re Welfare of Sego*, 82 Wn.2d at 739. Because only the trial court has the opportunity to hear the testimony and observe the witnesses, we defer to the trial court's judgment of the credibility of the witnesses and weighing of the evidence. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991).

John Smith does not dispute that the State proved the initial four elements found in RCW 13.34.180(1)(a)-(d). Instead, Smith assigns error to findings supporting satisfaction of the two elements in RCW 13.34.180(1)(e)-(f).

RCW 13.34.180(1)(e) focuses on whether the parent has corrected his identified parenting deficiencies. *In re Welfare of M.R.H.*, 145 Wn. App. at 27, (2008). RCW 13.34.180(1)(e) additionally reads:

> A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.

Even when evidence suggests that the parent may eventually correct parental deficiencies, termination is still appropriate when deficiencies will not be corrected within the foreseeable future. *In re Dependency of A.W.*, 53 Wn. App. 22, 32, 765 P.2d 307 (1988).

The court determines the "near future" in RCW 13.34.180(1)(e) from the child's vantage point. *In re Dependency of A.C.*, 123 Wn. App. 244, 249, 98 P.3d 89 (2004). What constitutes "near future" depends on the age of the child and the circumstances of the child's placement. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 205, 108 P.3d 156 (2005). For a younger child, a shorter period constitutes the "near future" than it does for an older child. *See In re Welfare of C.B.*, 134 Wn. App. 942, 954, 143 P.3d 846 (2006) A matter of months for young children is not within the foreseeable future to determine if there is sufficient time for a parent to remedy his or her parental deficiency. *In re Welfare of M.R.H.*, 145 Wn. App. at 28. One year was not in the foreseeable future of a three-

year-old. *In re Dependency of A.W.*, 53 Wn. App. at 32. Six months was not foreseeable in the near future of a fifteen-month-old. *In re Dependency of P.D.*, 58 Wn. App. 18, 27, 792 P.2d 159 (1990).

John Smith contends that, at the time of trial, he participated in ordered services, he showed an understanding of his toxic relationship with Connie Williams, he intended not to contact her, and he last contacted Williams in August 2018. Substantial testimony belies his contentions. Experts testified that Smith had failed to comprehend his codependent toxic relationship with Williams. According to mental health counselor Carla Paullin, Smith knew his relationship with Williams was toxic, yet he continued to see her. Paullin testified that, if Smith wanted to parent Carrie and Jane, he needed to work on impulsivity, boundaries, and transparency. Paullin wished Smith to forego contact with Williams for one year before either daughter returns to Smith's home. Counselor Amanda Clemons ended counseling after two years because Smith was not amenable to services. Clemons testified that Smith lacked insight into the impact on the girls of the domestic violence between Williams and him. Smith recently tested positive for heroin, cocaine, and methamphetamine. Despite court orders precluding contact, Smith married Williams in May 2018. He assaulted Williams in July 2018. Two months before the termination trial, Smith attempted to give Williams a ride in his vehicle.

*Issue 2: Whether substantial evidence supports the trial court's finding that continuation of the parent-child relationship diminished Carrie and Jane's prospects for early permanency?*

*Answer 2: Yes.*

John Smith contends that insufficient evidence supports the trial court's finding that continuing his parent-child relationship with his daughters diminishes their chances of early integration into a stable and permanent home. He also contends that he could continue contact with children without causing destabilization or affecting their current placements. We disagree.

Under RCW 13.34.180(1)(f), DCYF must prove that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." This termination element focuses on the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home. *In re Dependency of K.D.S.*, 176 Wn.2d 644, 658, 294 P.3d 695 (2013). This factor addresses the continued effect of the legal relationship between parent and child as an obstacle to adoption. *In re Dependency of A.C.*, 123 Wn. App. at 250 (2004). Fulfillment is strongest when children have potential adoption resources. *In re Dependency of A.C.*, 123 Wn. App. at 250. DCYF can satisfy

RCW 13.34.180(1)(f) in one of two ways. First, DCYF can prove prospects for a permanent home exist, but the parent-child relationship prevents the child from obtaining that placement. *In re Parental Rights to J.B.*, 197 Wn. App. 430, 438, 387 P.3d 1152 (2016). Alternatively, DCYF can prove the parent-child relationship has a damaging and destabilizing impact on the child that would hinder the child's integration into any permanent and stable placement. *In re Parental Rights to J.B.*, 197 Wn. App. at 438.

The trial court found that continuing John Smith's parent-child relationship with Carrie and Jane clearly diminished their prospects for early integration into a permanent and stable home. Substantial evidence supports this finding. At the time of trial, both girls resided in permanent adoptive homes. The potential adoptive parents meet the girls' needs. Social worker Laura Signorino opined that continuing the parent-child relationship between Smith and his daughters may confuse the girls and hinder their ability to move on to have a permanent home.

*Issue 3: Whether substantial evidence supports the trial court finding that terminating their father's parent rights furthered Carrie and Jane's best interests?*

*Answer 3: Yes.*

After satisfying the first prong, proof of the six elements listed in RCW 13.34.180(1), the second step in the State's burden in a parental termination case involves

establishing by a preponderance of evidence that termination is in the child's best interest. RCW 13.34.190(1)(b).  We accord the trial court broad discretion in determining the best interests of the child.  *In re Welfare of Young*, 24 Wn. App. 392, 395, 600 P.2d 1312 (1979).  No specific factors are involved in a best interest determination, and each case must be decided on its own facts and circumstances.  *In re Welfare of M.R.H.*, 145 Wn. App. at 28 (2008).  Nevertheless, when a parent has not remedied parental deficiencies over a lengthy dependency period, a court is justified in finding termination in the child's best interests rather than leaving the child in the limbo of foster care for an indefinite period while the parent seeks further rehabilitation.  *In re Dependency of T.R.,* 108 Wn. App. 149, 167, 29 P.3d 1275 (2001); *In re Dependency of A.W.*, 53 Wn. App. at 33, (1988).

John Smith first argues the trial court's best interest finding was premature because the State failed to prove all the factors in RCW 13.34.180.  We disagree with the premise of this argument since we already held that substantial evidence supported the trial court's findings of all factors.

John Smith next contends substantial evidence did not support the trial court's best interest finding.  We disagree again.  The trial testimony showed that Smith continued to

put his relationship with Connie Williams before his care of his children. The toxic relationship harms the children. Williams's drug abuse endangered the daughters.

*Issue 4: Whether substantial evidence supports the trial court's finding that John Smith was currently unfit to parent?*

*Answer 4: Yes.*

In addition to finding that the six statutory elements of RCW 13.34.180(1) have been satisfied and the best interests of the children are served, due process protections require that a court make a finding of current unfitness before parental rights can be terminated. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 479, 379 P.3d 75 (2016). Satisfaction of the six statutory elements raises an implied finding of parental unfitness. *In re Dependency of K.N.J.*, 171 Wn.2d at 577. To meet its burden to prove current unfitness, DCYF is required to prove that the parent's parenting deficiencies prevent the parent from providing for the child's basic nurture, health, or safety by clear, cogent, and convincing evidence. *In re Welfare of A.B.*, 181 Wn. App. 45, 61, 323 P.3d 1062 (2014).

Strong evidence supports the trial court's finding that John Smith is an unfit parent. According to experts, Smith lacks understanding of how his continued contact with Connie Williams places his children at risk. Due to his repeated pattern of returning to Williams, the court cannot trust Smith's promises that he intends to halt any future

contact with Williams. Smith cannot protect his children from their mother. Smith continues to engage in impulsive and violent behavior. We agree with Smith that he exhibits nurturing skills, but those skills do not hold priority over his other deficiencies.

John Smith relies on *In re Welfare of A.B.*, 181 Wn. App. 45, 64-65, 323 P.3d 1062 (2014), while claiming he is fit to parent because of the presence of no immediate or severe risks to Carrie and Jane's safety. In *A.B.*, this court found DSHS failed to meet its burden to prove the mother was currently unfit, when, although her cognitive impairment interfered with her ability to identify subtle safety risks to her child, no immediate or severe risks threatened the child's safety. The child had been removed from the home due to a safety risk posed by the father's abusive behavior, and the mother removed the risk by leaving the relationship. *In re Welfare of A.B.*, 181 Wn. App. at 64.

While relying on *A.B.*, Smith contends that any safety risks to his children are subtle, not serious. We disagree. Both Amanda Clemons and Carla Paullin identified the serious, lifelong safety concerns resulting from domestic violence. Paullin testified that domestic violence traumatically effects children even more than drugs and neglect. These are not "subtle risks."

## CONCLUSION

We affirm the trial court's termination of John Smith's parental rights to Carrie

Nos. 36948-0-III; 36949-8-III
*In re Dependency of X.S.*

and Jane.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Pennell, C.J.

25