

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No. 35794-5-III |
| N.S.N. | ) | (consolidated with |
| | ) | No. 35796-1-III, |
| | ) | No. 36148-9-III) |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, J. — The father and mother of now 8-year-old N.S.N. appeal the Chelan County Superior Court's termination of their parental rights. Following an unusually lengthy 45-month dependency, the court commissioner who presided over the dependency and termination proceedings terminated the parents' parental rights for reasons that included an ongoing flouting of the court's requirements. We affirm.

FACTS AND PROCEDURAL BACKGROUND

N.S.N. was born in April 2011, to a 15-year-old mother and a 17-year-old father. A few weeks after his daughter's birth, the father was incarcerated for four years. He had been charged initially with attempted murder stemming from a gang-related incident, but was allowed to plead guilty to a felony assault.

In early December 2013, the mother was caught shoplifting and assaulted the loss prevention officer who confronted her. She was charged with third degree theft and third

degree assault. Nine days later, when she was arrested on a warrant for the charges, a

large quantity of methamphetamine was found in her vehicle and Juan Rios-Guerra, who

was with her, was carrying an unlawfully loaded weapon. Both adults were arrested and

two-and-a-half-year-old N.S.N., who was in the car with them, was taken into protective

custody.

The Department of Social and Health Services (Department) filed a dependency

petition within a week. The dependency petition alleged that the mother had a juvenile

criminal history and a history of mental health issues. She was on active juvenile

probation and had tested positive for methamphetamine use in a urinalysis (UA)

performed the prior year. The petition alleged that the mother's ongoing drug use created

a physical and psychological danger to N.S.N., and her and the father's criminal activity

and resulting incarceration rendered them unavailable to care for her.

Presiding at a shelter care hearing the day after the petition was filed was Chelan

County's court commissioner, Bart Vandegrift, who would preside at almost all

subsequent dependency, guardianship, and parental termination matters involving N.S.N.

Commissioner Vandegrift ordered N.S.N. returned to the mother's care, but subject to

conditions. The mother and N.S.N. were to live in the Chelan County home of Ariel

Oquist, a family friend, and the mother was required to notify the Department's Division

of Children and Family Services immediately in the event of a move, in which case any

new residence would have to be approved. The mother was also required to participate in

psychological and drug and alcohol evaluations, was not to have contact with Juan Rios-Guerra or Jesus Rios Gutierrez, and was to submit to random UAs.

In January 2014, the mother told Cari Morris, the Department social worker originally assigned to N.S.N.'s case, that she was required to report to Chelan County Regional Jail by January 27 to serve 20 days for the charges filed against her the prior month. Ms. Morris prepared a motion that was heard by the court on January 22, approving N.S.N.'s residence with Ms. Oquist during the 20 days the mother served her jail time. But on February 18, 2014, the Department learned that the mother never reported to serve her sentence and instead was incarcerated in Oregon.

It turned out that at some point after meeting with Ms. Morris in January, the mother traveled to Oregon with N.S.N., without notice to or approval from the Department. On February 17, she was seen shoplifting, and was confronted. Antonio Zamudio, who was suspected of participating in the shoplifting with her, was able to flee, but the mother was detained and arrested. Methamphetamine was found in her purse. She was charged with and convicted of robbery and drug possession and received a 19-month sentence.

The Department learned that N.S.N. was at the Oregon home of her maternal grandmother, Tammy Redick, where she had been taken by Mr. Zamudio following the mother's arrest. Ms. Redick would later testify that before being dropped off at her home by Mr. Zamudio, N.S.N. had been in the care of the mother and Mr. Zamudio. At the

3

No. 35794-5-III, (consol. with No. 35796-1-III, & No. 36148-9-III)
*In re Parental Rights to N.S.N.*

Department's request, Ms. Redick delivered N.S.N. to its Vancouver, Washington, office. N.S.N. was placed in foster care in Chelan County.

Following a contested dependency hearing on February 24, 2014, an order establishing dependency was entered. A disposition order entered the following week required the mother to participate in a psychological evaluation, a drug and alcohol assessment and any recommended treatment, random UAs, parenting classes, and to find safe and stable housing. The disposition order required the father to participate in a drug and alcohol assessment and any recommended treatment, random UAs, an anger management or domestic violence assessment, a mental health evaluation, and a parenting assessment.

In May 2014, at the mother's request, N.S.N. was placed with a maternal aunt and uncle in Oregon, with the approval of the Department's Oregon counterpart.

While the mother was incarcerated in Oregon, she completed her GED,[1] anger management classes, and other life skill classes. A psychological evaluation was performed by Dr. Marc Stuckey, who met with her in prison. During the evaluation the mother self-reported that she smoked methamphetamine almost daily for a seven-`month period, from July 2013 to February 2014—a time frame during which N.S.N. was two years old. Dr. Stuckey did not perform a personality test on the mother, citing as reasons

---

[1] General education development certificate.

4

her young age, her incarceration, and her recent remission from methamphetamine use. Among his recommendations for further evaluation and treatment was that a second psychological evaluation, with personality testing, be performed.

Based on his testing and evaluation, Dr. Stuckey diagnosed the mother with adjustment disorder and severe stimulant use disorder in early remission. He expressed concerns about her "distress-tolerance, criminal history, [chemical dependency] usage, codependency, and thusly problem-solving [and] judgment as these have interfered with her capacity to place her daughter's needs above her own." Ex. 1 at 6.[2]

While N.S.N. was in the care of her maternal aunt, the aunt took N.S.N. to visit the mother once a month at the prison, and in 2015, the maternal aunt and uncle agreed to serve as N.S.N.'s guardians. An order appointing them guardians was entered in April 2015. Within a week of their appointment, however, the maternal aunt contacted the Department to report that she was having health and marriage problems and would not be able to serve. The guardianship was terminated and N.S.N. was placed, again, in Ms. Oquist's care in Chelan County.

By then, the father had recently been released from prison, having completed his sentence in March 2015. While serving his sentence, the father completed his GED, a

---

[2] All exhibits, clerk's papers, and reports of proceedings in this matter are sealed.

few college courses, an anger management course, and a chemical dependency assessment. He had written letters to N.S.N. while in prison.

Upon his release, the Department began referring the father for services. He also began supervised visitation with N.S.N. Although N.S.N. was upset and cried during some of their early visits, she later warmed up to her father and his visitations increased in frequency. During 2015, he participated in a number of recommended services and near the end of 2015, he had completed or was in the process of completing all of his court-ordered services.

In July 2015, the mother completed her Oregon and Washington incarcerations.[3] Upon her release, she moved to Oregon to complete the community supervision imposed by her sentence, living with her mother. While living in Oregon, she traveled to Chelan County weekly to visit N.S.N. She got a job in Oregon and enrolled in classes at the local community college. She also completed a mental health assessment and outpatient chemical dependency treatment in Oregon. The mental health assessment recommended that she engage in weekly counseling.

At the time of a December 2015 review hearing, the parents had complied with all their services and their visits with N.S.N. were going well. At the recommendation of the

---

[3] At the time of her arrest in Oregon in 2014, the mother had sentences remaining to be served in Washington, one of which was served before her Oregon incarceration and the other of which was served thereafter.

Department and guardian ad litem, Commissioner Vandegrift increased visits to four hours for each parent. It was also agreed at the review hearing that if visits continued to go well for a month, the Department would allow unsupervised and overnight visits. By early 2016, unsupervised and overnight visits were occurring and the plan was to return N.S.N. to her mother's care for a trial return home. The father did not feel ready to have N.S.N. placed with him given the limited size of his residence. The mother wished to have N.S.N. placed with her at Ms. Redick's home in Oregon, but the Department opposed the request, given what it characterized as Ms. Redick's "significant CPS[4] and criminal history." Report of Proceedings (RP) (Trial) at 303.[5] The Department preferred that the mother move back to Chelan County to live with Ms. Oquist, and when the mother agreed and returned to Washington, N.S.N.'s trial return home began in February 2016.

When the mother returned to Chelan County, community supervision required by her Oregon sentence was transferred to Washington. She became subject to a Washington condition of community supervision that she not have contact with known felons. This was brought to her attention following a traffic stop in late January 2016, in

---

[4] Child Protective Services.

[5] We refer to a verbatim report of proceedings that begins on December 4, 2017, and contains the vast majority of the trial proceedings with the parenthetical, "Trial." A shorter transcript contains a portion of the trial proceedings taking place on December 5, 2017, and is referred to with the parenthetical, "Trial Excerpt."

which the mother was discovered to be in the company of Avelardo Mendoza, a convicted felon. The mother told the patrol officer who stopped her that she had permission to associate with Mr. Mendoza. This was false. At a meeting in mid-February, Jennifer Gonzalez, a community custody officer (CCO) assigned to the mother's case, told the mother very specifically that she was not to have any contact with N.S.N.'s father or with Mr. Mendoza.

In March, within a month of N.S.N.'s trial return home, the father contacted Stacie Morales, who had replaced Ms. Moore as the Department social worker assigned to N.S.N.'s dependency, and told her he believed the mother and N.S.N. were spending time with Mr. Mendoza. He also suspected the mother of drug use based on a recent dramatic decrease in her weight. He believed that the mother and N.S.N. had spent overnights with friends, rather than at the Oquist home.

In light of the father's report, Ms. Morales spoke to the mother on March 28 and made a home visit on March 29. The mother said her relationship with N.S.N.'s father was not going well and responded with her own accusations of wrongdoing by him. She said she suspected the father of having flattened the tires on her car and showed Ms. Morales pictures on her cellphone received from the father that depicted "stacks of rubber banded large piles of money with stacks of drugs, what appeared to be drugs next to the money and a picture of what appeared to be [the father] holding an assault rifle." RP

(Trial) at 259. The mother agreed to forward the pictures and text messages to Ms. Morales, but never did.

On May 28, when the mother refused to answer questions about her weight loss, Ms. Morales asked her to submit to a UA the following day, which the mother agreed to do. During the home visit on May 29, however, the mother claimed that she spent an hour trying to provide a UA the day before, but had been unable to provide a sample. Ms. Morales told her to go back the next morning and complete a UA.

By coincidence, the Department of Corrections (DOC) called the mother on the morning of May 30 and ordered her to come in for a random UA. She arrived, but provided only an untestably small sample, even after being given over an hour to provide a sufficient one. When the mother was told that her failure to provide a sample was a community custody violation and she would not be allowed to leave, she complained that N.S.N. would be returning home on the Head Start bus with no one to pick her up. Officer Gonzalez notified Ms. Morales, who called Head Start to let them know she would go to the Oquist home to meet N.S.N. It turned out that the mother had called Mr. Mendoza to meet N.S.N., a fact Ms. Morales confirmed when Mr. Mendoza appeared at the Oquist home while Ms. Morales was awaiting N.S.N.'s arrival.

Officer Gonzalez and Ms. Morales also both learned on the afternoon of March 29 that the mother and father had encountered each other at a gas station the prior afternoon and the father had struck the mother in the face. On the afternoon of March 30, Officer

Gonzalez arrested the mother for three community custody violations: failing to submit to the UA, having contact with Mr. Mendoza, and having contact with the father. Mr. Mendoza's social security card was found in the mother's purse upon booking.

Upon the mother's arrest, N.S.N. was placed in a foster home. The father's visitation was suspended at around the same time, after N.S.N. disclosed to her CASA[6] that her father had punished her by placing her in a tree. The father's assault of the mother at the gas station led the Department to refer him for a domestic violence assessment. And in May 2016, based on N.S.N.'s foster parent's concern about her fearfulness and hypervigilance, N.S.N. began individual therapy with Kevin Riffel, which would continue, generally weekly, up to the time of the termination trial.

An administrative hearing was held to address the mother's several community custody violations on April 12. She received a sanction of the 13 days she had spent in jail, and with credit for the time served, she was released that day. She was required to report to the DOC office the following day, and when she did, she learned that her UA category had been called and she would need to provide a sample. She told Officer Gonzalez that her UA would be positive for Percocet, an opiate based narcotic. She was arrested for this further violation and remained in jail for 3 days.

---

[6] Court appointed special advocate.

No. 35794-5-III, (consol. with No. 35796-1-III, & No. 36148-9-III)
*In re Parental Rights to N.S.N.*

In the two and a half months that remained before the mother would complete her community supervision for the Chelan County matters, she committed two more violations for contact with the father, including one in which both were present at a residence when gun shots were fired. She served jail time for each: 14 days for contact on April 30, and 17 days for contact on June 13. Following her release for the last violation she asked that her supervision be transferred back to Oregon because she was tired of being arrested for associating with the father. Once back in Oregon and living with Ms. Redick, the mother continued to travel to Chelan County for visitation with N.S.N.

Termination

In July 2016, the Department filed a petition to terminate the parents' parental rights. The termination petition listed the parents' "criminality and incarceration, substance abuse, mental health issues, negligent parenting behaviors and a pattern of domestic violence" as the reasons for their inability to care for their daughter. 1 Clerk's Papers (1 CP) at 3-4.[7]

In late July 2016, the father was referred for a domestic violence perpetrator assessment. In August 2016, Commissioner Vandegrift ordered a second psychological

_____

[7] There are two volumes of clerk's papers, with overlapping page numbering. We refer to the volume provided to this court on January 25, 2018, as "1 CP" and the volume provided on August 23, 2018, as "2 CP."

11

evaluation for the mother and "attachment/relationship counseling" between the father and N.S.N.  The mother traveled to the offices of Dr. Tatyana Shepel for a clinical interview and personality testing in October and November 2016.  The father never completed the domestic violence assessment.

During the fall of 2016, the parties to the termination proceeding explored another relative placement for N.S.N.: a guardianship with Angelica Naranjo, a paternal aunt. N.S.N. was placed with Ms. Naranjo on a trial basis on November 23, 2016.  An order appointing Ms. Naranjo as guardian was entered on January 20, 2017, and the dependency proceeding was dismissed.  The order appointing Ms. Naranjo as guardian included the following directive with respect to the parents' visitation and contact with N.S.N.:

> Visitation and/or contact between the child and the parents shall be as follows:
>
> Mother: Once each month for 2 hours, supervised by the guardian or other adult approved by the guardian.  Visitation may be expanded at the discretion of the guardian.
>
> Father: Visitation is conditioned upon the father first completing necessary counseling with the child and the child's therapist, as recommended by the child's therapist.  Once completed, the father will have one visit each month for 2 hours, supervised by the guardian or other adult approved by the guardian.  Visitation may be expanded at the discretion of the guardian.

Ex. 21 at 3.

Within a week of entry of this order limiting their visitation and contact, and unbeknown to the Department, the parents traveled together to a Wenatchee school to

enroll N.S.N. in kindergarten.  In meeting with the school's office manager, they indicated that N.S.N. lived with them, providing their own address—not Ms. Naranjo's address—as N.S.N.'s residence.  Ms. Naranjo was identified as an emergency contact.  Both parents returned with N.S.N. the next school day, for her first day at the new school.

In a matter of days, there was a CPS referral that N.S.N. was living with her parents at her paternal grandmother's home.  In response to Department motions, the court ordered N.S.N. returned to foster care on February 1 and vacated dismissal of the dependency on February 8.  A hearing on the Department's petition to terminate the guardianship was conducted by Commissioner Vandegrift on April 5 and 11.  In his order terminating the guardianship, Commissioner Vandegrift entered strongly worded findings.  He found that it had been made very clear to Ms. Naranjo that the mother was not to have unsupervised contact with N.S.N. and that the father had not been cleared for even supervised contact.  He found that despite this, N.S.N. had admitted to several people that she was living with her mother and father and had also told them she was "'scared', because her mother had warned her that she would be 'taken away again if [Ms. Morales] finds out' that she was living with her parents."  Ex. 22 at 5.  Among Commissioner Vandegrift's findings were the following:

> 18. The guardianship was an alternative, negotiated settlement in the face of a termination of parental rights petition.  It came at a time when the father was not allowed contact with the child.  It came at a time when the mother was allowed limited, supervised contact with the child.  These issues were known to the aunt.  Yet within a few days following the entry of the

13

guardianship order and termination of the dependency, the aunt had essentially placed the child back with the parents.

. . . .

20. The aunt, Anjelica Naranjo, did not have the discretion to simply disregard everything that had been going on for the last four years, and throw it out the window at the first opportunity—before the ink was even dry on the order. Ms. Naranjo abused her discretion as guardian.

Ex. 22 at 7.

While the court affirmed the Department's finding of "negligent treatment" by Ms.

Naranjo, it added:

22. The court is of the opinion that the aunt was somewhat of a victim to these "pretty persuasive parents." In the court's view, the parents "laid in wait" until the guardianship and dependency cases were essentially concluded, and then "pounced" upon the aunt, who was incapable of saying no. The aunt, to a certain extent, was "victimized" by the parents here.

23. The court believes that it could fashion an order that the aunt would understand, and that the court could possibly trust her to attempt to enforce. However, the court has lost all trust with regard to the parents. The parents are to blame for actually creating this problem; too much focus may have been placed upon the aunt.

Ex. 22 at 7-8. Following termination of the guardianship, N.S.N. was placed back

in foster care.

Meanwhile, on January 10, 2017, Dr. Shepel had provided her report on the results

of the mother's evaluation and personality testing. While Dr. Shepel did not have

concerns about the mother's intellectual functioning, she diagnosed the mother with

severe amphetamine use disorder in sustained remission (per report) and a personality

disorder, not otherwise specified, with dependency and antisocial features. Her report

noted instances in which, based on the record provided by the Department, the mother was untruthful about her past relationships, drug use, and criminal history. Dr. Shepel concluded that the mother's lack of motivation was her most significant barrier to making improvements and being able to parent her daughter. Among Dr. Shepel's recommendations were that the mother continue with intensive individual mental health therapy and attend an ongoing dialectic behavior therapy (DBT) group.

Services ordered for the mother by the order entered following the dependency review hearing on August 17, 2016, included a further drug and alcohol evaluation, random UAs, and "counseling, including recommendations per Court Report/Case Plan." Ex. 19 at 11. Orders entered following hearings on January 18, 2017, and June 14, 2017, continued to identify counseling as an ordered service, although they did not indicate whether the mother was in compliance. Ex. 20 at 11, 28 at 11. Ms. Morales recalls reminding the mother at a roundtable discussion before one of the review hearings that counseling was an ordered service, and the mother responded that she intended to renew services with Life Works,[8] the provider in Oregon from whom she obtained chemical dependency treatment in 2015. The mother was deemed not compliant with her court-ordered counseling at the November 2017 permanency planning hearing.

---

[8] Ms. Morales and the mother had different recollections whether the provider was Lifewise or Life Works. In closing argument, the Department's lawyer accepted the mother's recollection that it was Life Works.

Although the mother had moved back to Oregon in 2017, she continued to travel to Wenatchee for visitation with N.S.N., using gas and lodging vouchers provided by the Department. The Department's provision of lodging vouchers was terminated on August 28, 2017, when staff at the motel at which the Department arranged for the mother to stay reported she had violated motel policy: she allowed unregistered guests to stay in the room being paid for by the Department, and either was not there herself or otherwise failed to respond when staff attempted to reach her to discuss the problem.

Services ordered for the father by the permanency planning order entered on January 18, 2017, included a drug and alcohol evaluation, random UAs, domestic violence perpetrator assessment/treatment and attachment/relationship counseling with Mr. Riffel and N.S.N. The order following the dependency review hearing on June 14, 2017, reflected the fact that he had begun therapy with Mr. Riffel and N.S.N. but was not in compliance with court ordered drug and alcohol or domestic violence services. The father had participated in "nine or ten" therapy sessions with Mr. Riffel when Mr. Riffel recommended that the therapy end, in light of the fact that N.S.N. had been placed into a pre-adoptive home and it was not in her best interest to build an attachment that was likely to end. RP (Trial Excerpt) at 75. The father was offered the opportunity to convert the therapy schedule into visitation with N.S.N., but never followed up with Ms. Morales. RP (Trial) at 245.

A three-day termination trial took place in early December 2017. Before trial, Commissioner Vandegrift granted a protective order that prevented an investigator for the mother from interviewing N.S.N. in preparation for trial. The Department offered the testimony of 15 witnesses at trial, whose testimony included the foregoing matters. The Department's witnesses included the mother's psychologists, the parents' community corrections officers, the social workers assigned to this case, an office manager from the Wenatchee school, the father's anger management counselor, the daughter's guardian ad litem, a visitation supervisor, 2 hotel employees, and the daughter's therapist. In the defense case, the mother testified and presented as additional witnesses one of N.S.N.'s former foster parents, her maternal grandmother, a visitation supervisor, and Ms. Oquist. The father did not attend the termination trial nor did his lawyer call any witnesses.

At the conclusion of the trial, Commissioner Vandegrift orally ruled that he would grant the Department's petition to terminate the parents' parental rights, commenting, in part, that the mother was "the most chronically dishonest person I have ever run across" and that his "primary duty" was to N.S.N. RP (Trial) at 434, 436. He also observed that "in hindsight" he believed that some of his prior decisions, which he thought were the best decisions at the time, had failed, and in that respect he had "failed" N.S.N. RP (Trial) at 437.

Following the commissioner's entry of findings and conclusions, the mother moved for a new trial, arguing that his comments revealed that he did not afford her a fair

trial. He denied the motion. The mother's motion for revision of the denial of a new trial was denied by the superior court. Both parents appeal.

ANALYSIS

In addition to challenging the sufficiency of the evidence to support the termination decision under the law as properly applied, the parents challenge the trial court's decision to grant a protective order preventing the defense from interviewing N.S.N. in preparation for trial. They also raise appearance of fairness and other challenges to Commissioner Vandegrift's conduct of the termination trial. We first address the challenges to the protective order and the commissioner's conduct of the trial before turning to the substantive merit of his termination decision.

I.       THE COMMISSIONER DID NOT ABUSE HIS DISCRETION IN GRANTING THE
         PROTECTIVE ORDER

After the Department received a request from the mother's lawyer that a defense investigator be allowed to interview then six-year-old N.S.N. in preparation for trial, the Department moved for entry of a protective order. It contended that subjecting N.S.N. to an interview for purposes of her parents' termination trial would be traumatic for her. At the hearing on the motion, Commission Vandegrift observed that treating a child as a witness in such a proceeding was "very unusual" and expressed his concern that a child "[could] blame herself for the rest of her lif[e] for termination of parental rights because hey, she gave evidence and the judge terminated my parental rights." RP (July 19, 2017)

at 18.[9]  When pressed at the hearing about why the interview was needed, the mother's

lawyer said she had a duty to investigate.  The only specific area of questioning she

disclosed was that she wanted to determine whether N.S.N. had retracted her report that

her father had disciplined her by putting her in a tree.[10]

The CASA was present at the hearing and expressed her view, which she said was

shared by the guardian ad litem, that N.S.N. should not be subjected to the interview.

She reported that the guardian ad litem questioned whether N.S.N. had anything relevant

to provide and pointed out that the mother had access to other sources of information,

such as N.S.N.'s therapist.  Additional sources of information included the adults with

whom N.S.N. lived during the dependency, two of whom the mother called as witnesses

at trial.

Upon obtaining the representations of the Department and the CASA that neither

intended to call N.S.N. as a witness or to offer child hearsay, the Commissioner granted

the Department's motion.  He ordered the Department and the CASA to immediately

notify the parents' lawyers if their position on calling N.S.N. or offering child hearsay

---

[9] Five months later, at the termination trial, Mr. Riffel would testify that N.S.N. did feel responsible for what was happening, because she was the one who told the school she was living with mom and dad.  RP (Trial Excerpt) at 85.

[10] New arguments are advanced on appeal as to what might have been explored in the interview, but we limit our consideration to what Commissioner Vandegrift was told in the mother's written submissions and specified at the hearing.  *See* RAP 2.5(a).

changed, and to provide specific information on what would be offered, through whom, and why. In that event, he said, the parents could renew their request for an interview.

"[F]or good cause shown," CR 26(c) authorizes a trial court to enter a protective order "which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The plain language of the rule "provides courts with broad discretion to tailor relief regarding the scope of discovery," and we review the decision to grant such an order for an abuse of discretion. *Dalsing v. Pierce County*, 190 Wn. App. 251, 262, 357 P.3d 80 (2015). "A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds" or "if it based its ruling on an erroneous view of the law." *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993).

"When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020. And by appointing a guardian ad litem, the court has some ability to protect a child from the prospect—frightening for a child—that she might say or do something "wrong" in the legal proceeding against her parents. It is the duty of the guardian ad litem "[t]o meet with, interview, or observe the child, depending on the child's age and developmental status, and report to the court any views or positions expressed by the child on issues pending before the court." RCW 13.34.105(1)(b). We find no abuse of discretion.

20

No. 35794-5-III, (consol. with No. 35796-1-III, & No. 36148-9-III)
*In re Parental Rights to N.S.N.*

Responding to the parents' argument that the inability to interview N.S.N.

deprived them of due process, the United States Supreme Court has observed that even in

the criminal context, "the Due Process Clause has little to say regarding the amount of

discovery which the parties must be afforded." *Wardius v. Oregon*, 412 U.S. 470, 474,

93 S. Ct. 2208, 37 L. Ed. 2d 82 (1973). To demonstrate a denial of discovery having

constitutional magnitude in a *criminal* case, a defendant must make a plausible showing

that she was deprived of evidence that would have been material and favorable to her

defense. *State v. Gonzalez*, 110 Wn.2d 738, 750, 757 P.2d 925 (1988). In a civil case, a

party must show prejudice from being denied the opportunity to depose a child.[11]

*Garratt v. Dailey*, 46 Wn.2d 197, 205, 279 P.2d 1091 (1955) (absent a showing of

prejudice, refusal to permit deposition of 5-year-old child was not reversible error even if

child was permitted to testify at trial). The parents have not demonstrated prejudice.

II.     THE PARENTS DO NOT PRESENT CIRCUMSTANCES REQUIRING COMMISSIONER
        VANDEGRIFT'S RECUSAL AS A MATTER OF DUE PROCESS, AND THEIR APPEARANCE
        OF FAIRNESS CHALLENGE FAILS

When the Department commenced the termination proceeding, the parents were

aware that Commissioner Vandegrift had presided over the dependency proceeding.

They filed no motion asking that he recuse himself in the termination case. It was only

---

[11] The mother points in her briefing on appeal to three statements by N.S.N. that
came into evidence during the termination trial. All were brief, and one was not offered
for its truth. The parents did not object to any of them on the basis that the Department
had violated the court's July 19 ruling.

No. 35794-5-III, (consol. with No. 35796-1-III, & No. 36148-9-III)
*In re Parental Rights to N.S.N.*

after his termination decision that the mother filed a motion for a new trial, complaining that his alleged bias denied her a fair trial and violated the appearance of fairness doctrine.

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980). Despite the breadth with which the United States Supreme Court has expressed the right to a "'fair trial in a fair tribunal,'" *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955)), "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997) (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986)). "Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar." *Id.* (citing, in part, A.B.A. Code of Judicial Conduct, Canon 3C(1)(a) (as amended 1980)).

The United States Supreme Court has identified three situations in which due process requires recusal: financial interests in the suit, cases where the judge was responsible for deciding whether a defendant should be charged (i.e. a "'one-man grand jury process'"), and "where someone with a personal stake in a proceeding has had a

22

significant and disproportionate role in placing the [judicial officer] on the case." *Tatham v. Rogers*, 170 Wn. App. 76, 91, 283 P.3d 583 (2012). None of these circumstances are present here. Due process is not implicated.

Turning to the appearance of fairness doctrine, Washington cases have long recognized that judges must recuse themselves when the facts suggest they are actually or potentially biased. *Id.* at 93. But as the State points out, if an appearance of fairness problem exists, it must be timely asserted or it is waived. "[A] litigant who proceeds to trial knowing of potential bias by the trial court waives his objection and cannot challenge the court's qualifications on appeal." *In re Welfare of Carpenter*, 21 Wn. App. 814, 820, 587 P.2d 588 (1978). By the same reasoning, a party knowing of potential bias cannot take her chance on trial and reserve her concerns about bias for a posttrial motion for a new trial. The burden of establishing a waiver is on the party asserting that the right has been waived. *Tatham*, 170 Wn. App. at 96-97.

The parents argue that waiver does not apply because they could not file an affidavit of prejudice against a court commissioner. But the State does not argue the parents waived the right to file an affidavit of prejudice. It argues they waived the right to assert that Commissioner Vandegrift's role in presiding over the dependency proceeding created an appearance of fairness problem. The latter was an issue that the parents had the right and opportunity to raise, as long as they did so timely. Because they

were aware of the commissioner's prior role and his occasionally adverse rulings, his prior role and rulings were waived as bases for requiring recusal.

Alternatively (and somewhat inconsistently) the parents argue that they were not aware of Commissioner Vandegrift's bias or possible bias until it was revealed by his oral decision at the conclusion of the termination trial. "There is a presumption that a trial judge properly discharged his/her official duties without bias or prejudice." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004). The party seeking to overcome that presumption must provide specific facts establishing bias. *Id.* Judicial rulings alone almost never constitute a valid showing of bias. *Id.*

We presume, then, that the commissioner said the negative things that he did about the parents because he found those things to be true. More than the presumption weighs in favor of the commissioner's fairness, because he had previously made some rulings that were quite favorable to the mother. The State's evidence presented during the trial supported negative findings about the parents' behavior and credibility. Insofar as the commissioner's negative findings supported his termination decision, it was appropriate for him to state them as part of his oral ruling. The parents do not point to any specific facts that establish that he was biased.

III.     THE PARENTS DO NOT DEMONSTRATE THAT COMMISSIONER VANDEGRIFT'S TERMINATION DECISION WAS BASED ON EXTRINSIC EVIDENCE OR THAT HE TESTIFIED

At a termination hearing, parents have the right "to receive a decision based solely on the evidence adduced at the hearing." RCW 13.34.090(1). As is typical of termination trials, the evidence in the record of the trial below included the dependency petition and 20 orders entered in the dependency proceeding. It included orders, findings and conclusions from the 2 guardianship proceedings. To demonstrate that Commissioner Vandegrift arrived at his decision in the termination trial based on extrinsic evidence or his own testimony, we would expect the parents to point to factual findings by the commissioner that are unsupported by the verbatim report of the witnesses' testimony at trial or the 45 exhibits admitted into evidence. They make no such demonstration.

Instead, while acknowledging that extensive evidence of the dependency proceeding was offered at the termination trial, the mother argues:

> [T]he record shows Commissioner Vandegrift was relying on his own personal knowledge and experience, not this evidence. Commissioner Vandegrift expressed his personal, subjective reasons for the decisions he made in the dependency proceedings. No reasonable jurist, upon review of the admitted orders from the dependency case, could have made these remarks because Commissioner Vandegrift acted like a witness.

Br. of Appellant-Mother at 38.

Our review of the hearing, findings, and order regarding termination of the parent-child relationship entered on January 3, 2018, belies this argument. With one exception,[12] the findings of fact are not couched in subjective terms. They appear to be findings that another jurist could have made if presented with the same termination trial record.

The parents err by basing their argument on the court's oral ruling. A court's oral opinion is "no more than a verbal expression of [its] informal opinion at that time . . . necessarily subject to further study and consideration, and may be altered, modified, or completely abandoned." *Ferree v. Doric Co.*, 62 Wn.2d 561, 567, 383 P.2d 900 (1963). Commissioner Vandegrift almost entirely dispensed with personal reflection when he entered his written findings and conclusions. The written findings and conclusions control, and they do not reveal that the court's decision was based on extrinsic evidence. *State v. Hescock*, 98 Wn. App. 600, 605-06, 989 P.2d 1251 (1999).

---

[12] Finding 2.13.1 states that "[a]t the time, the court thought that each of the decisions . . . were in the child's best interests; in hindsight, the court and the process has failed the child. Initially returning the child to the mother . . . seemed appropriate and safe." 1 CP at 185-86. Even these statements about Commissioner Vandegrift's personal beliefs are arguably inferences that could be drawn from the record by another jurist.

IV.    THE TRIAL COURT'S ERROR IN FAILING TO ENTER A FINDING REGARDING THE
       STATUS OF N.S.N.'S SIBLING RELATIONSHIP WAS NOT PRESERVED

In May 2017, the mother gave birth to a boy, V.N., whose father is N.S.N.'s father. An Oregon guardianship was established for V.N. within a matter of weeks, with Ms. Redick serving as his guardian.

The only *evidence* offered at trial as to the extent of V.N.'s contact with N.S.N. was the mother's testimony that N.S.N. knows she has a brother and wants to see him. In closing argument, the mother's lawyer stated that "[N.S.N.] has a biological brother who lives with the rest of the family who [N.S.N.] has met." RP (Trial) at 431.

RCW 13.34.200(3) provides that "[a]n order terminating the parent-child relationship shall include a statement addressing the status of the child's sibling relationships and the nature and extent of sibling placement, contact, or visits." The intent of the statute is "to recognize the importance of emotional ties formed by siblings with each other." LAWS OF 2003, ch. 227, § 1. Commissioner Vandegrift's written findings and conclusions do not include the required statement. Evidence presented at the termination trial would have been sufficient to support a finding that a sibling relationship existed, but no evidence presented would have enabled him to make a finding on the nature and extent of sibling placement, contact, or visits.

The court's written findings were presented and entered on January 3, 2018. They were signed "approved for entry," by both parents' lawyers. 1 CP at 191 (capitalization

omitted).  The transcript of the presentment hearing reflects that the following statements

were made:

> [DEPARTMENT COUNSEL]: The [N.S.N.] matter has been—the
> order has been approved by the parties, Mr. or Ms. Sellers is going to sign
> the order, approve it for entry at 10:30.
>
> THE COURT: Alright.
>
> [DEPARTMENT COUNSEL]: When she arrives.  So, I have that.
>
> [COURT ADJOURNED]

RP (Jan. 3, 2018) at 5.  Not only did the parents not raise the failure to make the sibling

finding at the time of presentment of the final order, the mother did not raise it in her

posttrial motion.

The remedy in the event of a failure to make the required finding is remand.  In

this case, however, because Commissioner Vandegrift has retired, the parents seek

reversal and a new trial, on the basis that a successor judge only has the authority to do

acts which do not require finding facts.  "Only the judge who has heard evidence has the

authority to find facts." *State v. Bryant*, 65 Wn. App. 547, 550, 829 P.2d 209 (1992).

A more appropriate approach to the oversight is to apply the general rule that we

do not review errors raised for the first time on appeal.  RAP 2.5(a).  We will not exercise

discretion to review this oversight.

V.      SUBSTANTIAL EVIDENCE, PROPERLY ANALYZED, SUPPORTS THE DECISION TO
        TERMINATE THE MOTHER'S AND FATHER'S PARENTAL RIGHTS

We now turn to the challenges to the substantive merits of the termination

decisions.

"The fundamental liberty interest of natural parents in the care, custody, and

management of their child does not evaporate simply because they have not been model

parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*,

455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).  Because parents have a

fundamental liberty interest in the custody and care of their children, the State may

terminate parental rights "'only for the most powerful [of] reasons.'"  *In re Welfare of

S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (alteration in original) (internal

quotation marks omitted) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896

P.2d 1298 (1995)).  Washington statutes respond to this constitutional command by

providing a two-step process before a court may terminate parental rights.

In the first step of the process, the State must prove six statutory elements

provided by RCW 13.34.180.  These elements "focus[ ] on the adequacy of the parents

and must be proved by clear, cogent, and convincing evidence."  *In re Welfare of A.B.*,

168 Wn.2d 908, 911, 232 P.3d 1104 (2010) (*Salas*) (footnote omitted).  "Clear, cogent

and convincing evidence exists when the evidence shows the ultimate fact at issue to be

highly probable."  *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113

(1999). In addition to finding the six statutory elements, due process requires that a court make a finding of current parental unfitness before parental rights can be terminated. *In re Dependency of K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132 (1995) (citing *Santosky*, 455 U.S. at 747-48). This finding need not be made explicitly and satisfying all six of the statutory elements raises an implied finding of parental unfitness. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 479, 379 P.3d 75 (2016).

The second step is for the court to ascertain the best interests of the child. RCW 13.34.190(1)(b). "Because the parent's rights will already have been observed in the first step, this second step need be proved by only a preponderance of the evidence." *Salas*, 168 Wn.2d at 912.

In reviewing a trial court's decision to terminate parental rights, we will uphold its factual findings "if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *K.S.C.*, 137 Wn.2d at 925. "Because of the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.'" *K.M.M.*, 186 Wn.2d at 477 (quoting *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)). We defer to the trial court's determinations of witness credibility and the persuasiveness of the evidence. *Id.* We review de novo whether the trial court's findings of fact support its conclusions of law. *Id.*

A.     The mother's parental rights

The mother challenges the trial court's conclusions that (1) all necessary services

were expressly and understandably offered or provided to her, (2) there was little

likelihood that conditions would be remedied so that N.S.N. could be returned to her in

the near future, and (3) she was currently unfit to parent N.S.N.  In challenging these

conclusions, the mother argues that the court misapplied the law in two respects.  We

address the challenged conclusions in the order stated.

> 1.     Substantial evidence supports the commissioner's conclusion that the State offered necessary services as required by RCW 13.34.180(1)(d)
>
> > a.  The mother was on notice before the termination trial that mental illness was one of her parental deficiencies

As a preliminary matter, the mother contends that her right to due process was

violated because she was not notified that her personality disorder would support

termination.

Among the circumstances alleged by the dependency petition to require State

intervention was the fact that in May 2013, following multiple threats to kill herself, the

mother

> was taken into custody, transported to the hospital, and admitted for a
> physical and mental health evaluation.  Deputy Norton contacted CPS
> because he was concerned about [the mother]'s numerous threats to commit
> suicide and the safety of [N.S.N.] under [the mother]'s care.  During this
> CPS investigation, it was discovered that [the mother] has a history of

31

mental health issues; however, she often diminishes and denies her
symptoms.

Ex. 4 at 3.

The December 2013 shelter care order required the mother to participate in a full

psychological examination "as soon as can be arranged." Ex. 5 at 11. The disposition

order entered in March 2014 carried forward a requirement that she complete a

psychological examination.

Dr. Stuckey's November 2014 report, from the mother's first psychological

evaluation, explained why he had not performed personality testing, but observed that

"concerns remain about her distress-tolerance, criminal history, CD [chemical

dependency] usage, codependency, and thusly problem-solving/judgment as these have

interfered with her capacity to place her daughter's needs above her own." Ex. 1 at 6.

In addition to recommending an additional psychological examination with personality

testing at a later date, Dr. Stuckey recommended "directive individual/group counseling

in order to increase problem-solving skills, relaxation skills, and relational/

communication issues to include setting/maintaining appropriate boundaries for her and

her daughter while vetting those with whom they have contact." *Id.* at 7-8.

The petition to terminate the parents' rights provided the following explanation of

why N.S.N. had been removed from her parents' care:

> The child was removed from the care of the parents due to a pattern
> of criminality and incarceration, substance abuse, *mental health issues*,

negligent parenting behaviors and a pattern of domestic violence, each of
with [sic] rendered the parents unfit to care for the child.

1 CP at 3-4 (emphasis added).  The termination petition further alleged:

In May 2016, *the court order*[*ed*] *the mother to engage in MH* [(*mental
health*)] *services* and the mother requested DV [(domestic violence)]
counseling.  The Department made a referral to [a DV counseling provider]
while the mother was incarcerated, and they were to see the mother while
she was in jail.  *The Department has not had any indication that the mother
accessed a MH assessment since the May hearing.*  The court ordered the
Department to file a termination petition.

1 CP at 4-5 (emphasis added).  Finally, the termination petition alleged:

Since the trial return home failed[,] the mother has relapsed by using
a controlled substance, engaged in a pattern of criminality resulting in
incarceration, *failed to comply with ordered mental health treatment* and
exposed the child to domestic violence.  The father has engaged in a pattern
of criminality, incarceration and domestic violence.

1 CP at 6 (emphasis added).  Orders entered following case reviews beginning in August

2016, consistently reflected the fact that counseling, including recommendations per

court report/case plan, was a court-ordered service.

Dr. Shepel's report was completed on January 10, 2017, 11 months before the

termination trial.  She diagnosed the mother with severe amphetamine use disorder, in

sustained remission (per report) and personality disorder, not otherwise specified with

dependent and antisocial features.  Her prognosis for the mother becoming a safe parent

for N.S.N. as of January 2017 was guarded.  She stated:

It is very important to understand that [the mother] is a young, immature,
and at times dishonest young woman who often relies on others to meet her

> needs and who has a serious drug addiction problem and antisocial personality features. [The mother] may demonstrate a short improvement in her decision making and lifestyle but she needs extensive mental health therapy and a personal commitment to abstain from associating with unsafe people in order to remain clean and sober and to demonstrate the stability of choices.

Ex. 3 at 15.

The mother was represented by the same lawyer from the time of the shelter hearing through the termination trial. As the lawyer observed in requesting a trial continuance so that she would be able to represent the mother following her (the lawyer's) maternity leave, the mother's lawyer had a "historical knowledge of the case, facts, parties, witnesses, experts, visit supervisors, social workers, CASA volunteers, and counsel." 1 CP at 79. The mother identifies no point in the three day termination trial at which her well-prepared trial lawyer objected that the State's reliance on the mother's personality disorder was a surprise. The mother's lawyer addressed both Dr. Shepel's report and the personality disorder diagnosis in her closing argument, never claiming they were unrelated to any identified parental deficiency. RP (Trial) at 430, 432.

Due process requires that a parent receive notice and an opportunity to be heard. *In re Welfare of Key*, 119 Wn.2d 600, 611, 836 P.2d 200 (1992); *see also In re Moseley*, 34 Wn. App. 179, 184, 660 P.2d 315 (1983). The termination petition need not "be the source of notice of all parental deficiencies." *In re Parental Rights to F.M.O.*, 194 Wn. App. 226, 230, 374 P.3d 273 (2016). The Department can provide notice to a parent by

34

offering or providing services that will address the specific deficiency. *See id.* at 231-32.

Whether a proceeding satisfies due process is a question that we review de novo. *In re*

*Welfare of J.M.*, 130 Wn. App. 912, 920, 125 P.3d 245 (2005).

The mother cites *In re Dependency of A.M.M.*, 182 Wn. App. 776, 332 P.3d 500

(2014), and *F.M.O.* in support of this claim of a due process violation. In both of those

cases, however, this court found that the trial court based its termination decision in part

on a parental shortcoming that was identified during testimony during trial, but had not

been identified as a deficiency at any point leading up to trial. Here, the deficiency was

identified from the beginning and the mother and her lawyer knew that the mother had

been out of compliance with court-ordered individual therapy—identified by Dr. Shepel

as the most important treatment for the disorder—for at least a year. The second

psychological evaluation resulted in a more refined diagnosis, made available 11 months

before trial, which the defense was able to prepare to defend. No due process violation is

shown.[13]

---

[13] In a statement of additional authorities, the mother cites *In re Dependency of G.C.B.*, No. 77943-5-I (Wash. Ct. App. Mar. 4, 2019) (unpublished), https://www.courts .wa.gov/opinions/pdf/779435.pdf. In *G.C.B.*, the trial court relied, at least in part, on a psychologist's one-hour observation of the father in which he perceived the father as "'normal from a cognitive perspective'" but as exhibiting "'schizoid personality characteristics.'" *Id.*, slip op. at 5. The father testified that he never received the psychological evaluation and it was never discussed with him. Here, the mother was aware of Dr. Shepel's evaluation and that mental health counseling was a court-ordered service.

b. The evidence was sufficient

The State's burden of proving it offered "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future" requires proof that it offered services "tailored to each individual's needs." *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). While the legislature has not defined "necessary services," case law has defined the term to mean "those services 'needed to address a condition that precludes reunification of the parent and child.'" *K.M.M.*, 186 Wn.2d at 480 (quoting *A.M.M.*, 182 Wn. App. at 793).

"Even in instances where the Department inexcusably fails to offer all necessary services, termination may still be appropriate if the service would not remedy the parent's deficiencies within the foreseeable future." *Id.* at 486. The time frame for "foreseeable future" is dependent on the child's age. *Hall*, 99 Wn.2d at 851.

The trial court's findings 2.12.1 to 2.12.3 and 2.12.9 to 2.12.15 address the mother's parental deficiencies and the services the Department offered to address them. The mother assigns error to five of the findings, but she raises only one challenge to the sufficiency of the Department's evidence: she argues that the Department failed to expressly and understandably offer group dialectical behavior therapy.

Among the trial court's relevant findings were the following:

- Following a failed in-home placement in 2016, the mother was ordered to complete a second chemical dependency assessment. The court also continued to order parenting education and counseling,

- In the fall of 2016, the mother participated in a second psychological evaluation with Dr. Shepel, who subsequently produced a report dated January 10, 2017. Dr. Shepel diagnosed the mother as having a personality disorder, with antisocial and dependent features.

- Dr. Shepel testified that the antisocial feature of the mother's personality disorder includes difficulty with problem-solving, hostility, and poor impulse control.

- Dr. Shepel testified that medication is ineffective to treat personality disorders, and that long-term, intensive therapy was needed. She recommended that the mother engage in long-term, weekly individual therapy for a period of 6 to 12 months, and also recommended group DBT, if available.

- The mother has been in possession of Dr. Shepel's evaluation report for some time now. The report clearly stated her mental health problem, and what was needed to address it.

- The mother was involved with a counseling agency which could have provided counseling to address her personality disorder.

- The mother did not engage in any additional counseling on her return to Oregon in 2016. The social worker testified that she had learned that group DBT was offered by the counseling agency in Oregon that the mother had previously attended, and had informed the mother of this.

- Dr. Shepel testified that the mother would need to accept that she needs treatment, in order to achieve any significant change.

- If the mother was engaged and committed to therapy in order to address her personality disorder, she would need 12 months to demonstrate significant change, according to Dr. Shepel. While it is possible for the mother to achieve a stable foundation of change within a 6-month period, she was not in compliance with a court-ordered chemical dependency evaluation or UA testing, and had continued to violate court orders. In Dr. Shepel's opinion, the mother is at great risk for relapse into drug use, and is not motivated to change.

- The court does not think that there is anything else that could have been done.

1 CP at 223-25 (Findings 2.12.3, 2.12.12-2.12.15).

The only one of the foregoing findings that is not supported by the evidence is the finding that Ms. Morales informed the mother that group DBT was offered by the agency in Oregon where the mother had previously received services. Ms. Morales testified, instead, that when Ms. Morales reminded the mother that counseling remained an ordered service, the mother said she planned to re-engage with the Oregon agency, and Ms. Morales was aware that the agency offered DBT groups. Ms. Morales further testified that when the mother re-engaged in counseling, standard protocol would be for the agency to obtain Dr. Shepel's evaluation.

As Ms. Morales testified, attending a DBT group was not a court-ordered service. Dr. Shepel never stated in her report or in her testimony that attending a DBT group was a necessary service. In fact, Dr. Shepel corrected the Department's lawyer when he misunderstood her to say that the minimum six months' treatment needed to see improvement in the mother was six months of DBT. She explained:

> My recommendation for six months relates to *individual mental health therapy*. But, dialectical—which is the primary source of change. Dialectical behavioral therapy is a component of a recommendation, but not the primary factor. As far as I know, it's quite difficult to find dialectical behavioral therapy groups and there is a long wait list and also I would say group therapy in this format should be in addition to individual mental health therapy.

RP (Trial) at 125 (emphasis added). In cross-examining Dr. Shepel, the mother's lawyer did not ask her anything about DBT.

38

The court found, and substantial evidence supports its finding, that the Department expressly and understandably informed the mother that counseling was an ordered service, that the mother was aware for 16 months before the termination trial that she was not in compliance with the requirement that she obtain counseling, and that the mother had made no effort to be in compliance, even with the individual therapy component of Dr. Shepel's recommendation. No concern had been raised about the mother's intellectual functioning. She provides no legal authority for the proposition that the Department's requirement to offer services operates at the granular level of explaining the type of treatment likely to be provided in the course of a court-ordered service.

Finally, "even where the State inexcusably fails to offer a service to a willing parent . . . termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future, which depends on the age of the child." *T.R.*, 108 Wn. App. at 164. Dr. Shepel testified that the typical length of dialectical behavior therapy is 12 months. As discussed in the next section, the mother does not contest the finding that the near future for N.S.N. was somewhere between 2 and 6 months.

2.      Sufficient evidence supports the court's finding that there is little likelihood that conditions will be remedied in the near future as required by RCW 13.34.180(1)(e)

RCW 13.34.180(1)(e) requires a demonstration "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." "A determination of what constitutes the near future depends on the age of the

child and the circumstances of the placement." *In re Dependency of T.L.G.*, 126 Wn. App. 181, 204, 108 P.3d 156 (2005). Moreover, RCW 13.34.180(1)(e) provides that if the State makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided and the parent has failed to substantially improve his or her parental deficiencies within 12 months following entry of the dispositional order, then a rebuttable presumption arises that there is little likelihood that return of the child in the near future will be possible.

The mother does not challenge the commissioner's finding that the "near future" for N.S.N. was 2 to 6 months. She argues that Dr. Shepel testified it was possible she could demonstrate change in 6 months, however, and that the mother testified she was "not . . . opposed to" the counseling Dr. Shepel said would be required. RP (Trial) at 385. "Accordingly," the mother argues, "the evidence affirmatively established that [she] could remedy the 'conditions' . . . in the 'near future' (six months)." Br. of Appellant-Mother at 57-58. But Dr. Shepel testified that 6 months was a *minimum* for demonstrating change, and that 12 months was a more likely time frame. Moreover, Dr. Shepel testified that the 6-month minimum was possible for a patient who was engaged in weekly intensive therapy, with "no more infractions with regard to Court orders," and "changes in her problem solving," and "in her insight regarding her past dysfunctional . . . choices," and "personal responsibility," and "[u]nderstanding the value of honesty

and the reduction of . . . oppositional behavior toward authority, rule breaking and dishonesty." RP (Trial) at 125-26.

Elsewhere, speaking of her perceptions of the mother, Dr. Shepel testified, "[U]nfortunately, lack of motivation is the greatest obstacle in [the mother]'s improvement and her ability to parent [N.S.N]. It's really consistent with her personality disorder traits, with lack of insight, very high level of defense and denial of any shortcomings . . . . It's diagnostically, people with such responses will drop out of therapy or would not benefit from treatment because of lack of motivation." RP (Trial) at 121.

The commissioner could reasonably conclude that the evidence did not support a "best case scenario" for the mother. His findings on this element include the following findings, which are supported by substantial evidence:

- During the dependency both parents continued to ignore the consequences of violating community custody conditions.

- The parents continued to undermine the opportunities presented to them.

- The mother has testified that she has no parental deficiencies.[14] The mother is not in a position to admit that she has a personality disorder, is not ready to engage in treatment, and does not have a counselor in place.

---

[14] Asked at trial about her "current ability to parent [N.S.N.]," the mother answered, "I feel like I can care for her um completely, a hundred and ten percent." RP (Trial) at 382.

- Dr. Shepel testified that the mother has taken no responsibility for the choices she has made, and showed no insight into her shortcomings.

- The mother's lack of motivation to change is the major obstacle in addressing her personality disorder.

- If the court leaves the child waiting in her current foster home while the mother engages in counseling to address her personality disorder, the chances of success are not good.[15]

1 CP at 186-87 (Findings 2.13.2-2.13.6). Again, deference to the trial court is particularly important in termination proceedings. *K.M.M.*, 186 Wn.2d at 477.

3. The commissioner made an explicit finding that the mother was currently unfit and the mother does not demonstrate any misapplication of law

   a. The commissioner did not confuse the second-stage consideration of a child's "best interest" with the requirement to first find parental unfitness

As previously stated, in addition to finding the six statutory termination factors, due process requires that a court make a finding of current parental unfitness before parental rights can be terminated. *K.R.*, 128 Wn.2d at 142 (citing *Santosky*, 455 U.S. at 747-48). While demonstrating all six of the statutory termination factors *can* permit an appellate court to infer current parental unfitness, a record in a given case *might not* permit the inference. In *Salas*, 168 Wn.2d at 921-22, our Supreme Court refused to draw

---

[15] The mother challenges the trial court's finding that Dr. Shepel testified that a personality disorder "distorts the way an individual views and interacts with the world, is long-standing, and not easily treated." 1 CP at 184-85. This testimony was provided, but it was provided by Dr. Stuckey, not Dr. Shepel. RP (Trial) at 26.

the inference where many of the trial court's findings suggested that the father, while maybe not the best available parent, was nonetheless a fit parent. It concluded that the facts as found by the court did not support a finding of parental unfitness. *Id.* at 926-27.

Commissioner Vandegrift made an explicit finding that the mother was currently unfit. But the parents argue that his findings suffer from the same confusion found in *Salas*, focusing on the commissioner's statement in his oral ruling: "my primary duty is to [the daughter], not to you. My secondary duty is to you and reunification of the family, but first and foremost, I'm supposed to be looking out for what's best for your daughter." RP (Trial) at 436-37. The court's written findings likewise state, "The court's primary duty is to do what is in the best interest of the child. The court's secondary duty is to the parent and to do what is best for the family." 1 CP at 185 (Finding 2.13.1).

Chapter 13.34 RCW deals with dependency and the termination of parent-child relationships, and its statement of legislative intent makes clear that the rights and safety of a child are more important than the rights of a parent who jeopardizes the child's nurture, health, or safety. RCW 13.34.020 states:

> The legislature declares that the family unit is a fundamental resource of American life which should be nurtured. Toward the continuance of this principle, the legislature declares that *the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized. When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail. In making reasonable efforts under this chapter, the child's health and safety shall be the paramount concern.* The right of a child to basic nurturing includes the right to a safe,

stable, and permanent home and a speedy resolution of any proceeding under this chapter.

(Emphasis added.)  In this respect, Commissioner Vandegrift's statements were not in error.

There is another stage at which a child's best interest is considered in the parental termination context, and that is where the State has proved the six statutory termination factors yet the trial court is satisfied that termination is not in the child's best interest.  "If the court determines that termination is not in the best interests of the child, it has discretion not to order a termination even if [the State] has established the allegations of RCW 13.34.180(1)-(6)."  *In re Dependency of A.V.D.*, 62 Wn. App. 562, 571, 815 P.2d 277 (1991) (citing *In re Dependency of Ramquist*, 52 Wn. App. 854, 860, 765 P.2d 30 (1988)).

It is clear from the commissioner's oral ruling and written findings and conclusions that he had the correct two-step process in mind.  He explicitly differentiated in both his oral statements and written findings between the first stage consideration of the termination factors and current parental fitness, on the one hand, and the second stage consideration of N.S.N.'s best interest.

> b.      Sufficient evidence supports the finding that the mother was currently unfit

"To meet its burden to prove current unfitness in a termination proceeding, [the Department] is required to prove that the parent's parenting deficiencies prevent the

parent from providing the child with 'basic nurture, health, or safety' by clear, cogent, and convincing evidence." *In re Welfare of A.B.*, 181 Wn. App. 45, 61, 323 P.3d 1062 (2014). When a parent suffers from a mental condition, the "mental illness is not, in and of itself, proof that a parent is unfit or incapable[,]" rather courts "must examine the relationship between the mental condition and parenting ability." *T.L.G.*, 126 Wn. App. at 203.

Commissioner Vandegrift found that "[t]he mother has regularly attended visitation with her daughter *in a limited, controlled environment*, and her visits have been entirely appropriate." 1 CP at 188 (emphasis added). He found that "[t]he record also reflects that the mother can adequately provide for the child's nutrition, hygiene, and clothing *in a controlled setting*." *Id.* (emphasis added). The court nonetheless found that "[*w*]*hile in the community*, the mother has demonstrated that she cannot make safe choices as a parent for any length of time." *Id.* (emphasis added). These findings were supported by the testimony of Dr. Shepel. Asked whether N.S.N. could be placed with her mother while undergoing therapy, she answered that she did not think so because she would expect the mother "not to be a fit parent for [N.S.N.] at this time. I would not recommend reunification at this point unless there's therapy, at least for six months." RP (Trial) at 130.

To similar effect, the report of the guardian ad litem stated that the mother, "when [N.S.N.] was in her care, failed to make decisions that were protective of her daughter's

health, safety and stability." 1 CP at 164. Finally, Dr. Shepel's evaluation had described the mother's mental condition as "severe enough to result in criminal behaviors, drug use, association with unsafe persons with criminal past[s] and drug and alcohol use, and potentially exposing [the daughter] to the unsafe environment," and the commissioner found that despite court-ordered random UAs, the mother had not been submitting to the random UA testing requested by the social worker. Ex. 3 at 14.

While the mother cites this court's 2014 decision in *A.B.* in challenging Commissioner Vandegrift's findings, *A.B.* is inapposite. The mother in *A.B.* was diagnosed with "a cognitive disorder not otherwise specified (cognitive impairment) and impaired intellectual abilities." 181 Wn. App. at 49. She was deemed "unfit because her cognitive impairments prevented her from making intuitive judgments, grasping child development, perceiving subtle dangers to children, understanding the impact of things on children, or communicating effectively with her child." *Id.* at 57. Division Two reversed the termination order because a parent's mental condition that results only in an inability "to understand child development and identify subtle safety risks" does "not present an immediate or severe risk to the child's safety." *Id.* at 64-65. The safety risks the commissioner found to be posed for N.S.N. were of an entirely different order of magnitude.[16]

---

[16] The parents also assign error to the findings regarding RCW 13.34.180(1)(f) and that termination was in the daughter's best interest. Br. of Appellant-Mother at 4

No. 35794-5-III, (consol. with No. 35796-1-III, & No. 36148-9-III)
*In re Parental Rights to N.S.N.*

B.      The father's parental rights

In addition to the assignments of error already addressed, the father challenges two of the trial court's conclusions in terminating his parental rights for related reasons. He argues, first, that the State did not prove that parent-child psychotherapy, which he argues was a necessary service, was expressly and understandably offered to him. On that basis, he argues that because a necessary service was not offered, the State is unable to prove there was little likelihood that conditions would be remedied so that N.S.N. could be returned to him in the near future.

The father correctly states that the dependency petition identified one of his parental deficiencies as being that he had been incarcerated for the majority of N.S.N.'s life and "does not have a relationship or bond with her." Ex. 4 at 3. In August 2016, however, the father was ordered to participate in "attachment/relationship counseling" with N.S.N. Ex. 19 at 12. The order entered after the permanency planning hearing on January 18, 2017, also reflected "attachment/relationship counseling w/ child/child's therapist" as an ordered service, and that the father had not yet complied. Ex. 20 at 7. Dr. Shepel's January 10, 2017, psychological evaluation of the mother includes the

(Assignments of Error 27-32); Br. of Appellant-Father at 2 (Assignment of Error 11). The parents do not provide arguments addressing why the court erred when it found that continuing the parents' relationship with their daughter prevented the daughter's prospects for early integration, or why termination was in the daughter's best interest. We will not address these assignments of error. RAP 10.3(a)(5)-(6); *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

47

mother's report that while the father could not spend time with N.S.N. until he was out of prison, "Now she understands that he is her dad," and "I know from the time that he has been with her, she got connected and bonded with him." Ex. 1 at 4.

The commissioner's order entered following the June 14, 2017 dependency review hearing indicated that at that point, the father *had* complied with the required attachment/relationship counseling with N.S.N. and her therapist. Ex. 28 at 7. So did the order entered after the November 15, 2017 permanency planning hearing. Ex. 29 at 7.

Ms. Morales testified at the termination trial that the father participated in therapy sessions with Mr. Riffel and N.S.N. For a reason she was never asked to explain, she did not view them as "attachment therapy" even if the court considered them to have satisfied the court-ordered requirement for "attachment/relationship counseling."

Mr. Riffel testified that he had 9 or 10 therapy sessions with the father. Ms. Morales testified that before the termination trial, she learned from Mr. Riffel at a family team decision making meeting that he was no longer concerned about N.S.N. having visitation with the father. At that point she told the father that his therapy could be converted to visitation and he needed to contact her about a visitation schedule. She testified that despite that conversation and "a few" conversations with the father's lawyer, the father never resumed visitation. RP (Trial) at 245.

The State argues that the absence of a bond or attachment with N.S.N. was not relied on by Commissioner Vandegrift as a basis for terminating the father's parental

rights.  We agree.  The findings that explain the commissioner's concerns in terminating

the father's rights were not that the father had not established a bond with N.S.N.—he

had.  It was that he had untreated domestic violence and chemical dependency issues, and

his continuing criminal involvement was once again making him unavailable as a father.

The commissioner made the following relevant findings:

- Mr. Riffel worked with the father for 9 or 10 sessions to address barriers to his relationship with his daughter.  The child eventually became comfortable in the presence of her father, and the Department informed the father that visits could resume.  The father failed to contact the Department to schedule visitation.

- The father assaulted the mother in the child's presence.  He has not yet engaged in a domestic violence perpetrator's assessment which is court-ordered; if recommended, treatment can take up to one year to complete.

- He has been incarcerated at times throughout the dependency for violations of his felony probation, which has rendered him unavailable as a parent.  His probation counselor, Erik Pheasant, testified that the father has had a total of at least seven violations thus far, and had an active arrest warrant at the time of trial for failure to appear for a urinalysis test.  The father did not appear for the termination trial.  Mr. Pheasant estimated that the father had eight or nine months of probation remaining, but that when he is not available—as he was at the time of trial—his probation period is extended.  The father has previously had two extended periods—95 days and 61 days—where he was on warrant status and which extended his probationary period.

- Also of concern, Mr. Pheasant testified that the mother called him recently to express her concern that the father was using drugs, based on his erratic behaviors, aggressive conduct, and irrational statements which she had observed.

- The father is currently unfit as a parent due to his unresolved domestic violence history and instability resulting from his criminal sentence.

1 CP at 184, 188 (Findings 2.12.8, 2.13.7, 2.13.9).

49

No. 35794-5-III, (consol. with No. 35796-1-III, & No. 36148-9-III)
*In re Parental Rights to N.S.N.*

No witness testified that the "parent-child psychotherapy counseling" that the father argues was a necessary service was, in fact, necessary to address a condition that precludes reunification of the father and N.S.N. No other evidence supports the argument that it was a necessary service. The court did not find that the lack of an attachment between N.S.N. and her father was something that precluded reunification.

Because the father does not demonstrate that parent-child psychological counseling was a necessary service, we need not address his argument that the failure to provide it prevented the State from proving that there was little likelihood conditions would be remedied so that N.S.N. could be returned to the father's care in the near future.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

50